472 So.2d 927 (1985)
Larry ROBERTSON, Sr.
v.
Connie PENN and American Indemnity Company.
No. 84 CA 0022.
Court of Appeal of Louisiana, First Circuit.
May 20, 1985.
Rehearing Denied June 27, 1985.
*928 Bruce C. Bennett, Hammond, for plaintiff-second-appellant.
James R. Carter, New Orleans, for defendant-first-appellant.
Before EDWARDS, SHORTESS, SAVOIE, CRAIN and COVINGTON, JJ.
SHORTESS, Judge.
Larry Robertson, Sr. (plaintiff), as administrator of the estate of his minor son, Larry Robertson, Jr., (Larry) brought this suit against Connie Penn (defendant) and American Indemnity Company, plaintiff's uninsured motorist carrier, to recover damages sustained when Larry and defendant were involved in an automobile-bicycle collision.
A jury found Larry 95% negligent and defendant 5% negligent and fixed Larry's damages at $10,000.00. Plaintiff filed Motions *929 for a Judgment Notwithstanding the Verdict, Additur and For a New Trial. The trial judge with oral reasons granted the JNOV as to liability, reduced Larry's negligence to 25% and increased defendant's negligence to 75%. He also increased plaintiff's damages to $15,000.00 and assessed all costs to defendants. The Motions for Additur and a New Trial were denied. Defendant and American Indemnity have brought this appeal.
The issues on appeal are:
1. Whether it was contrary to the law and evidence for the trial judge to use a JNOV to rearrange the liability percentage or to increase the amounts of damages;
2. Whether the amount of damages given by the trial judge and jury was excessive; and
3. Whether it was erroneous for the trial judge to assess total costs against defendants.

JNOV
The law regarding JNOV and whether it was the correct procedural device for the trial judge to use in reapportioning liability and raising damages has changed since the matter was before the trial court. The Louisiana legislature has amended LSA-C.C.P. art. 1811, clearly giving the trial court authority to consider both issues under this motion.[1] Additionally, Price v. Louisiana Farm Bureau Mutual Insurance Company, 457 So.2d 722 (La.App. 2nd Cir.1984), held the amendment to be procedural in nature and applied it retroactively. We agree.
Whether the correct legal standard was applied or the judge committed manifest error in the use of that standard are separate questions.
Neither LSA-C.C.P. art. 1811 nor its repealed predecessor LSA-C.C.P. art. 1810.1 provided a standard for trial judges to apply in deciding whether to use the JNOV. In two recent cases, we have discussed the evolution of the standard used in Louisiana from the U.S. Fifth Circuit case, Boeing v. Shipman, 411 F.2d 365, 374 (1969), which held:
On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidencenot just that evidence which supports the non-mover's casebut in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.
Thus, we have held that a JNOV should be granted only when the evidence points so strongly and overwhelmingly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. Frank Bickham, Jr. and Frank Bickham, Sr. v. Timothy H. Goings, et al., 460 So.2d 646 (La. App. 1st Cir.1984) and Frank P. Arnone v. Illinois Central Gulf Railroad, 461 So.2d 325 (La.App. 1st Cir.1984). We must examine the record to determine whether the judge's conclusions[2] on liability and quantum were manifestly erroneous.

*930 FACTS
Although much of the evidence is disputed, it is uncontradicted that the accident occurred on July 13, 1981, around 4 p.m. Defendant was taking the "back way" on Old Independence Highway to avoid slow-moving traffic on Highway 51 to pick up her mother in Independence. She admitted that she was running late and that although she had traveled that route five or six times before she did not like to do so because her mother had warned her to watch out for children playing on the street "a lot." Old Independence Highway is a narrow two-lane undivided blacktop road with ditches but no shoulders. Lighting and weather conditions were clear. The collision with Larry's bicycle occurred about one-tenth of a mile past the intersection of Old Independence Highway and Highway 51 in a residential area.
Defendant testified that she observed a right curve and 45 miles per hour speed limit signs but did not see any "slow watch for children" signs; that she slowed to 20-25 miles per hour when she first saw five or six children playing in the street, then to 5-10 miles per hour; that she honked four or five times when she first saw the childrenabout 50 to 75 yards from Larry; that she and Larry were heading South; that Larry was in the right-hand lane; and that she was in the center to avoid the children. When asked whether she was attempting to pass Larry, defendant replied that she was not, rather she was "trying to avoid" him as much as possible. "That's the reason I was in the center of the street. It was impossible for me to get on the left side because a kid was on the left side of the street." She maintained that she was driving carefully to avoid an accident but when she was "even with the child on the right he turned into my right front bumper." She also stated, "At impact I was going five to ten miles per hour because my feet was on the brakes. Immediately after impact I put on brakes." She insisted that she left her car where it came to a stop after impact.
Eleven-year-old Larry testified that when the car "got right up on" him, "it blowed the horn, when it did I reacted to the horn.. right when it blowed I turned my head and the bicycle wheel." He refuted a contradictory explanation given during deposition that he was getting ready to cross the street, but at no time did he deny that he turned the wheel or that the car's right front bumper had hit him. He said that impact occurred in the right lane and he was one to two feet from the edge of the road; that when the bumper hit his leg, it bent and pressed his leg into the bicycle, bending the frame; that he went over the top of the car, landing in back of it on his head about one or two feet from the edge of the ditch while his bike flew into the ditch; and that he noticed the car's tail lights as it backed up.
It is not clear whether defendant's reference to the "kid on the left side of the street" was meant as a reference to fourteen-year-old motorcyclist Tony Rylan, who was approaching her car in the correct lane from the opposite direction. Tony, who knew Larry only casually, was the only disinterested eyewitness to the accident. He testified that he and Larry were the only two children on the road; that he observed the approaching car in the center of the road and pulled off the road; that he was about 8 or 10 feet away from Larry when he saw him react to the horn, turn in front of her, and "she hit him"; that Larry landed "about the same place he started off; that he just went over the car and landed about two feet from the ditch" on the right side of the road; that the car did not appear to slow down prior to impact, nor did he hear the horn "until she got right up on us."
Deputy Sheriff Durwood Stewart, dispatched about 4:00 p.m. to investigate the accident, arrived on the scene at 4:20 p.m. He observed the car pointing south, a bicycle in front of it and broken glass on the road. He found no skidmarks and estimated that the car had traveled approximately five feet after impact. He testified that the point of impact occurred in the right, southbound lane. He recorded the presence *931 of a sign indicating the speed zone but found nothing which would have obscured vision.
In response to special interrogatories, the jury found both defendant and Larry negligent, with the negligence of both a proximate cause of the accident and injuries. Assigning the greater percentage of negligence (95%) to Larry, the jury found that Larry did not assume the risk of the accident so as to bar his recovery. It fixed damages at $10,000.00.
Both parties were negligent. However, apportionment of negligence depends upon application of the facts to legal presumptions. It is uncontroverted that, by her own admission, defendant was familiar with the road, had been warned about and observed children playing near or on the road, was late and taking a shortcut, knew the road had no shoulders, observed Larry riding his bicycle in the southbound right-hand lane 50 to 75 yards before the collision, originally drove in the center of the road to avoid hitting other children, and slowed but did not brake before impact. Also, the right front bumper of her car hit Larry's leg as he turned in front of her.
There is conflicting testimony or evidence about how many children were in the road, when or how often she honked her horn, the presence of "slow watch for children" signs, her speed, and, most important, the point of impact and location of her car after the accident. The most reliable testimony was that of Deputy Stewart who saw the speed zone sign but did not mention a curve warning sign, nor a sign warning about children. The only evidence indicating speed is the absence of skidmarks and Deputy Stewart's observation that the car traveled only five feet after impact (if the car remained in that location until measurements were completed). Although he gave no explanation of his reasoning, Stewart determined the point of impact to be in the right lane.
Despite contradictions in Larry's testimony, he always admitted turning in front of the car. However, there is one major contradiction in defendant's testimony: she said she was in the center of the road at impact and left her car where it ended up afterward. If Deputy Stewart reasoned that the collision occurred in the right-hand lane and if she did not move the car, then she had to have been in the right-hand lane when she hit Larry. It makes no sense to assume that she was in the road's center at impact, then moved the car to the right, especially if she was attempting to avoid hitting Larry.

LEGAL PRESUMPTIONS
It is well settled that Louisiana jurisprudence places a high degree of care upon a motorist who sees a child on or near the road and imposes upon him a duty to anticipate that the child, possessed of limited judgment, might be unable to appreciate impending danger, is likely to be inattentive, and might suddenly place himself in a position of peril. However, the law does not make the driver an insurer of a child's safety. Each case turns upon the facts. Dufrene v. Dixie Auto Insurance Co., 373 So.2d 162, 164 (La.1979); writ denied, 378 So.2d 1390 (La.1980); Fusilier v. City of Houma, 421 So.2d 418, 419-420 (La.App. 1st Cir.1982). A motorist who observes the presence of a child on a bicycle ahead of him is placed under a high degree of care, and should anticipate that the child is possessed of limited judgment and that the child's action might be sudden and unpredictable. Kelly v. Messina, 318 So.2d 74, 77 (La.App. 4th Cir.1975).
Bicyclists, however, also have responsibilities and are subject to the same duties applicable to drivers of vehicles when driving upon highways in this State, and thus have a never-ceasing duty to keep a proper lookout at all times. And a bicyclist, as a motorist, must be certain before executing a left turn, that the turn can be made without danger from normal overtaking or oncoming traffic. LSA-R.S. 32:194. Bird v. Black, 420 So.2d 1280, 1281-82 (La.App. 3rd Cir.1982). Our courts may hold a child negligent but recognize that a child is not held to the same degree of care as an adult. The test is whether the particular child, considering his age, background, *932 and inherent intelligence, indulged in gross disregard of his own safety in the face of a known risk, understood and perceived the danger. Carter v. City Parish Government of East Baton Rouge, et al., 423 So.2d 1080, 1086 (La.1982).
Where there is no bicycle path or shoulder as here, the bicyclist has no choice but to ride on the highway. Larry was riding where he should be, about one or two feet from the edge of the road in the right lane. If he was turning left he should have made certain there were no cars behind him before doing so. Even if he merely pulled the wheel to the left when startled, his reaction was careless. Although the driver maintained she was doing all within her power to avoid hitting plaintiff, had she been going slow enough and maintaining enough control for the conditions which warranted extreme caution she should have been able to avoid the accident. The presence of children on the road places the highest duty of care on the motorist, requiring her to take "every available means to apprise the person in danger of his precarious position and at the same time exercise all maneuvers possible to avoid injury." Riley v. American Motorists Insurance Company, et al., 365 So.2d 904, 906 (La.App. 4th Cir.1978). If defendant honked her horn when she was 50 to 75 yards from Larry, she should have been aware of his inattention. Or, if she honked just as she was beside him, she should have been aware that she could startle him with unpredictable results. In either case, she failed to exercise all maneuvers possible to avoid injury, since the location of her car after impact indicates she was too far into the right lane to pass him safely.
Since this child is not guilty of gross disregard of his own safety in face of a known risk, he is not precluded from recovery under a duty-risk analysis (see Carter) or a comparative negligence scheme (see LSA-C.C. art. 2323) because he is not 100% at fault. But because Larry was careless the judge was not manifestly erroneous in apportioning 25% of the fault to him. Nor was the judge manifestly erroneous in increasing the defendant's proportion of negligence to 75% since she bore the greater duty of care. The trial judge correctly applied the JNOV standard. Apportioning 95% of the fault to plaintiff was clearly erroneous because the evidence pointed so strongly to the fact that defendant was too far into the right lane to pass plaintiff safely, thus violating her greater legal standard of care. The only reasonable conclusions a jury could have reached would have fixed a much greater percentage of fault to her.

DAMAGES
Larry received emergency treatment for his head wound immediately after the accident at Hood Memorial Hospital in Amite. Dr. Reginald E. Goldsby sutured the almost six-inch scalp laceration but neither x-rays nor his examination showed any evidence of skull fracture or brain damage. Larry suffered a concussion but no loss of consciousness. Other injuries included left knee tenderness and right arm abrasions. Antibiotics were prescribed as a precaution against infection. Dr. Goldsby changed the dressing the next day and discharged Larry when he removed the sutures one week later.
Larry continued to complain of weakness and his left knee giving out. He was seen on December 15, 1982, one year and five months after the accident, by Dr. Dropadi L. Kewalramani, a Physical Medicine and Rehabilitation specialist. Her examination showed injury to the medial collateral ligament, bone contusion to the head of the fibula, and infrapatella bursitis, with pain, tingling and loss of the left knee's range of motion. Neurological examination showed involvement of cranial nerves. Larry responded to treatment which consisted of medication and exercise. After Larry's third and final visit on January 30, 1983, Dr. Kewalramani concluded that he had a 10% permanent sensory loss in the peroneal nerve and residual sciatic nerve damage, but an essentially normal knee function. She also noted a difference in the size of *933 his pupils, indicating past mid-brain bleeding. She found his injuries consistent with those depicted in post-accident photographs. Although he told her his pain was exacerbated by playing football or basketball, she did not think he was in acute distress.
Dr. William J. Kelly, a plastic and reconstructive surgeon, testified that he examined Larry's 5½-inch by 1/2-inch scalp laceration one year and nine months after the accident. He considered the scar and accompanying hair loss permanent but of a cosmetic nature and said any attempt to remove it would only create a larger scar with greater hair loss. Wearing his hair "stylishly long for a normal 12-year-old" covered the scar in his opinion.
Considering the extent of Larry's injuries which caused him to drop out of remedial summer classes, we cannot say that the jury abused its great discretion in awarding him $10,000.00. A jury's assessment of damages will not be set aside unless it is found that it abused its much discretion. Since we cannot say that evidence points so overwhelmingly to abuse of jury discretion [Reck v. Stevens, 373 So.2d 498 (La.1979)], or its application of incorrect legal standards as to quantum, reasonable men could differ as to the amount to award Larry for his injuries. Therefore, the JNOV standard was not properly applied to the damages issue nor do we find the award excessive. We therefore reinstate the jury award of $10,000.00.

APPORTIONMENT OF COSTS
Assessment of costs may be made to reflect the percentage of negligence attributed to each party, Price, 457 So.2d at 729, or the trial judge may assess costs in any equitable manner. Upon review, a trial judge's assessment of costs can be reversed by this court only upon a showing of abuse of discretion. LSA-C. C.P. art. 1920. Courtney v. Winn-Dixie Louisiana, Inc., 447 So.2d 504, 510 (La. App. 5th Cir.1984), writ denied, 449 So.2d 1359 (La.1984). No abuse of discretion has been shown. All costs are taxed to defendant and American Indemnity.
AFFIRMED IN PART, REVERSED IN PART AND RENDERED.
SAVOIE, J., dissents and assigns reasons.
EDWARDS, J., dissents for the reasons assigned by SAVOIE, J.
SAVOIE, Justice, dissenting.
I respectfully dissent from that portion of the majority opinion which affirms the action of the trial judge in granting a JNOV as to the assignment of the percentages of fault. I agree with the standard in the majority opinion that a JNOV should be granted only when the evidence points so strongly and overwhelmingly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. See Bickham v. Goings, supra, and Arnone v. Illinois Central Gulf Railroad, supra. I feel that the evidence in the present case shows that the jury's decision should not have been disturbed.
The major reasoning for affirming the action of the trial judge in granting the JNOV is stated when the majority opinion states: "Apportioning 95% of the fault to plaintiff was clearly erroneous because the evidence pointed so strongly to the fact that the defendant was too far into the right lane to pass plaintiff safely, thus violating her greater legal standard of care." I believe this to be a misstatement of the role of the fact-finder to "weigh" the legal standard of care of the defendant with that of the plaintiff. Rather, the fact-finder is to first determine whether the defendant breached the standard of care legally required of her, and then whether this breach of that standard was a proximate cause of plaintiff's accident and injury. The fact-finder must then determine whether plaintiff breached the standard of care legally required of him, and whether this breach of that standard was a proximate cause of his own accident and injury. *934 The fact-finder must then assign a percentage of fault of each party to the accident. The jury interrogatories in this case correctly guided the fact-finder in its role in the trial process.
The fact-finder in the present case found that the plaintiff was 95% at fault in the accident. I feel the record shows the evidence was not so strongly and overwhelmingly in favor of the plaintiff that reasonable men could not reach different conclusions.
The evidence shows that Connie Penn (defendant), while traveling down a narrow highway nearing a residential area, noticed children playing in the area. She testified that she did not see a sign warning of children in the area, but she did state that her mother had previously warned her of the possibility of a group of youths enjoying recreational activity in the vicinity. Accordingly, she took the appropriate step and reduced her speed. It is undisputed that at the time of the impact, Penn was lightly braking and was only traveling at between 5 and 10 miles per hour. There is dispute over the point at which Penn blew her horn. She states it was 50 to 75 yards away and another witness stated the horn was blown as Penn came alongside the plaintiff. Penn testified that she was in the center of the street trying to avoid plaintiff. She stated that she could not have gotten completely over in the left lane because of the presence of a northbound motorcyclist.
Penn also testified, and other evidence also showed, that the impact occurred approximately two feet from the shoulder of the highway. I do not feel that this is contradictory to her testimony of being in the center of the street. There was repeated testimony that the street was narrow. It is certainly possible for Penn to have been approximately in the center of the street and yet have an impact with a bicycle that turns into her two feet from the shoulder on such a narrow roadway. While Penn may have breached the duty of care that she take "every available means to apprise the person in danger of his precarious position and at the same time exercise all maneuvers possible to avoid injury," the jury found that this breach of that duty only consisted of 5% of the fault in the accident. I feel that this certainly is a conclusion that reasonable men could reach and, therefore, would reverse the judgment of the trial court in granting the JNOV on this issue.
For the above foregoing reasons, I dissent.
NOTES
[1] LSA-C.C.P. art. 1811(F) states: "The motion for a judgment notwithstanding the verdict may be granted on the issue of liability or on the issue of damages or on both issues." The editorial comment points out that Paragraph F was intended to overrule Rougeau v. Commercial Union, 432 So.2d 1162 (La.App. 3rd Cir.1983), writ denied, 437 So.2d 1149 (La.1983), which held the JNOV to be an incorrect substitute for additur and remittitur procedures in jury cases.
[2] Unfortunately there is no record of the trial judge's reasons in the JNOV hearing since both attorneys waived its recordation.