484 So.2d 168 (1986)
Maudie Scott, Wife of/and Curtis E. SCOTT
v.
HOSPITAL SERVICE DISTRICT NO. 1 OF ST. CHARLES, State of Louisiana and All Risk Corporation of Louisiana.
No. 85-CA-501.
Court of Appeal of Louisiana, Fifth Circuit.
February 13, 1986.
Rehearing Denied March 17, 1986.
Writ Granted May 30, 1986.
*170 Weidemann & Fransen, Lawrence D. Wiedemann and C. Scott Carter, New Orleans, for plaintiffs-appellees.
Watson, Blanche, Wilson & Posner, Peter T. Dazzio, Baton Rouge, for Hosp. Service Dist. No. 1 of Parish of St. Charles, State of La., d/b/a The St. Charles Parish Hosp., and Southern American Ins. Co., defendants-appellants.
Before BOUTALL, CHEHARDY and CURRAULT, JJ.
CHEHARDY, Judge.
Maudie Scott and her husband Curtis E. Scott instituted this suit for personal injuries, damages and loss of consortium resulting from a slip-and-fall accident of Mrs. Scott at the St. Charles Parish Hospital in Luling.
Named defendants were the Hospital Service District No. 1 of the Parish of St. Charles, State of Louisiana, and its insurers Southern American Insurance Company and Mead Reinsurance Corporation, the excess carrier.
The matter was tried by a jury which awarded Mrs. Scott $330,000 and her husband $50,000 for a total judgment of $380,000. She was found to be 60% at fault and the Hospital 40% at fault. Therefore, in accordance with the jury verdict, judgment was rendered in her favor for $132,000, and her husband for $20,000, after the reduction for comparative negligence, against all defendants.
Thereafter plaintiffs filed motions for judgment notwithstanding the verdict, and/or a new trial or an additur. Defendant Mead filed a motion for a new trial and/or to amend the judgment recognizing that their policy issued to Hospital Service District No. 1 for the Parish of St. Charles was excess insurance, over and above that coverage provided by defendant Southern American Insurance Company which has a policy limit of $500,000. The other defendants filed an application for a new trial, or alternatively judgment notwithstanding the verdict, or remittitur. After a hearing on these motions the trial court granted plaintiff's motion for judgment notwithstanding the verdict on both the issue of liability and quantum. It increased the percentage of the fault of the hospital from 40% to 100% and increased the award to plaintiffs from $380,000 to $500,000, and amended the judgment to reflect that Mead Reinsurance Corporation was the excess carrier and that the judgment was not effective as against Mead unless the final judgment should exceed or exhaust the limits of the Southern American Insurance Company coverage.
The Hospital and Southern American have appealed.
The record reflects the following facts:
On October 27, 1982 Mrs. Scott went to Room 220 in the St. Charles Parish Hospital to visit her daughter who had undergone back surgery at 7 a.m. that morning. The daugther was returned to her room about 8:30 a.m., at which time the nurses checked her pressure and got her settled. Her daughter was not fully conscious when the nurses left the room, and Mrs. Scott was asked to contact the nursing station as soon as her daughter started to awaken because it would be necessary to turn the patient to prevent pneumonia.
Mrs. Scott's version of the accident is as follows:
When her daughter started to awaken about 10:45 a.m. she went out the door of her room, turned left and started to walk toward the nurses' station. She was dressed in pants, a blouse and slippers.
There was furniture along that wall: a cart, bed, chairs and a night stand. A man was in the hall using a buffing machine. Because of the furniture lining the hall she *171 had only a 2- to 3-foot passageway. When she passed Room 225 she slipped on the floor right at the doorway, did a split, and landed hard on her left knee. She never saw any signs in or near the doorway and did not know the floor was wet until she fell and her pants were wet from the knee down.
Mrs. Scott stated she got up, limped to the nurses' station and informed the nurse she had fallen in water in front of Room 225. The nurse put her in a wheelchair, took her back to where it happened and talked to the men (who were working on that room stripping the floor), and then took her to the emergency room where she was x-rayed, her knee wrapped in an ace bandage, and she was given something to relieve the swelling.
There were no eye witnesses to the accident, but the testimony of the two men who were on the scene, and the nurse who assisted Mrs. Scott shortly thereafter, are important in determining the issue of liability. Those witnesses are Mrs. Celia Holmes, the nurse, and Johnny Pierre and Warren Bourgeois, two hospital employees who were stripping the floor of Room 225 at the time of the accident.
Mrs. Holmes testified she was the charge nurse (supervisor) on duty at the time of the accident. She stated the nursing station is about four rooms down from Room 225, the scene of the accident, and that Mrs. Scott came to the desk and told her she had slipped on the floor wet with soap and hurt her left knee. Plaintiff told her she knew the floor was wet, but the witness was unable to state whether plaintiff knew it was wet before she fell, or only discovered it was wet after the accident.
Mrs. Holmes put plaintiff in a wheel chair as soon as she told her what happened and they went to look at the area where she fell. The nurse saw a red sign with yellow lettering that said "Wet Floor" about a foot wide and 2 feet high near the door of the room. The sign stands on metal legs. Two maintenance men were working there cleaning the floor inside the room. There was equipment in the hallway, but half of the hallway was empty.
The nurse then took Mrs. Scott to the emergency room and filled out the emergency room record. This report indicated what Mrs. Scott had told her about the accident, and was the first written report made. Mrs. Scott had told her she had stepped across wires and cords from the equipment. The nurse said these were located behind the "wet" signs, but that plaintiff had not tripped on the cords, but slipped on the wet floor. The equipment was in front of Room 225.
In Mrs. Holmes' opinion there was sufficient room to walk in the hall on the other side of the "Wet Floor" sign because the whole other side of the hall was empty. She indicated the furniture in the halla bed, dresser, and a big chairwere much farther down the hallway on the end, but the equipment wire was inside of Room 225 and there was a little bit of water in the hallway because they do strip a small area outside of the doorway.
Johnny Pierre testified he was stripping the floor in Room 225 on the day of the accident. He had put some of the furniture in the bathroom and the rest of the furniture (the bed on the opposite side of the hall) at the very end of the hall. He saw plaintiff after she fell, about one-half foot from a "Wet Floor" sign right at the door to the room. He went to ask her if he could be of help. She said it was nobody's fault, she was not hurt, and she left. He said she was in a hurry. She came walking back with the nurse who took his name and then they left. He admitted his buffer, wax cart and cleaning cart were on the opposite side of the hall from Room 225 but said 3 feet of the hall in that area was unobstructed.
At the time of the incident Mr. Pierre was putting the strip cart on the opposite side of the hall and he was not in the room. He did not see plaintiff fall, but when he turned around she was on her knees. His co-worker was in another room preparing to take the furniture out of that room. Pierre was going to strip Room 225 while *172 his helper was taking the furniture outside of Room 224. The water had already been put on the floor of the room but no one was in it, and the stripper, called "Buckeye Blue" was on the floor. This is a commercial stripper something like soap, but it makes no suds. It is mixed with water and applied with a mop. He had finished this procedure and then went to get the buffer. The witness stated the "Wet Floor" sign was facing the way you walk into the room.
Warren Bourgeois testified at the time of the accident he was going to get the vacuum cleaner and when he turned around he saw plaintiff on the floor in front of Room 225. He agreed that a bed, eating table and a chair were along the opposite hallway. When plaintiff got up she used the side railing of the doorway to pull herself up. She was near the wet floor sign. The witness also stated there was a cart in the hall, but plaintiff had plenty of room to walk on the other side of the hall. He said he did not help with the stripping because Mr. Pierre did it all but he knew Buckeye Blue had been used on the floor and that it was slippery. He denied seeing plaintiff in a wheelchair.
From a review of all of this testimony it is clear that plaintiff fell in front of Room 225 as a result of slipping on Buckeye Blue and that the maintenance men realized the product had dangerous propensities and knew it had to be handled with care. It is also clear that the halls were obstructed on both sides, cluttered with furniture on one side and wires from a buffing machine also on the other side, so anyone negotiating that hallway would have to be very careful to avoid injury. While Mrs. Scott did not see a "Wet Floor" sign, the other three witnesses all stated there was such a sign at the door to the room.
As a result of the accident, Mrs. Scott suffered chondromalacia of the patella, requiring surgical repair. As a result of that surgery she developed thrombophlebitis, a painful and sometimes life-threatening vascular condition. She required treatment by orthopedic and vascular surgeons as well as physical therapy and psychiatric treatment.
Prior to deliberating, the jury was taken to the scene to view the area, without, of course, the various obstructions that were in the hall at the time of the accident.
The jury was given a series of special questions to answer in arriving at their verdict. Those questions were:
"1. Was defendant, Hospital Service District No. 1 of St. Charles and its employees Johnny Pierre and/or Warren Bourgeois, guilty of substandard conduct which proximately caused plaintiff's damages? [Answer:] Yes.
"2. If your answer to Question 1 is `yes,' what is the degree of defendants' * * * fault, expressed in a percentage? [Answer:] 40%.
"3. Was plaintiff, Maudie Scott, guilty of substandard conduct that proximately caused her own damages? [Answer:] Yes.
"4. If your answer to Question 3 is `yes,' what is the degree of plaintiff's * * * negligence, expressed in a percentage? [Answer:] 60%.
"5. What is the total amount of damages expressed in dollars suffered by plaintiff * * * without making any reduction for her own substandard conduct, if any? [Answer:] $330,000. * * *
"6. Did plaintiff Curtis E. Scott suffer a loss of consortium, services and society as a result of his wife's injury and disability? [Answer:] Yes.
"7. If your answer to Question 6 is `yes,' what is the total amount of damages expressed in dollars that [he] sustained? [Answer:] $50,000." * * *
Although the trial court initially rendered judgment in accordance with this verdict, the judge later rendered judgment notwithstanding the verdict, assigning the following reasons.
The judge stated he sat through three days of testimony and spent another three *173 days after the trial trying to decipher why the jury arrived at its decision. He stated he was shocked at the jury finding because he concluded there was no way that reasonable minds could have differed on the question of liability in this case. The judge concluded that Buckeye Blue was not just ordinary water, it was a very hazardous material; the employees knew they had to be very careful because they could easily slip themselves while applying it.
The judge found that the Buckeye Blue got into the hallway, where it was known not only visitors but also sick people would be walking. He found that plaintiff was an invitee. He also found the employees did nothing to remedy the hazardous condition. He stated further that "if you believe their testimony" Mr. Pierre took a sign which said "Wet Floor" and placed it by a doorway to prevent people from going into a room; that the sign, "if it was placed," was merely in the doorway of the hall facing the opposite wall and a person walking in the hall could not read it. The judge stated he would assume the sign was there, but he found the sign did not fulfill the duty to warn because with Buckeye Blue on the floor more than a wet floor sign was necessary.
He concluded the floor was wet with ultrahazardous material, stating that one "Wet Floor" sign was insufficient and the area should have been roped off or several signs posted to stop people from going in that area. He further found that Mrs. Scott could not have seen the sign "if it was there."
The trial judge concluded that reasonable minds could not have differed, because the burden of proof to show contributory negligence was on the plaintiff and there was no testimony to show Mrs. Scott did anything other than walking normally down the hall. When she reached the Buckeye Blue she fell and the fact she may have ended up in close proximity to the sign right next to the door indicates the sign was right in the doorway and not in the hall.
The judge stated that, in his mind, the jury committed manifest error, they did not follow his instructions, and they did not prove plaintiff was guilty of contributory negligence. He therefore increased the fault of defendants from 40% to 100%, finding no evidence whatsoever of negligence on the part of Mrs. Scott.
Appellants assert the trial court erred in the following:
1. In failing to allow defendants to offer in evidence the incident report of the hospital and plaintiff's own diagram attached to her deposition;
2. In finding defendants negligent despite the placement of a "Wet Floor" warning sign;
3. In rendering judgment notwithstanding the verdict increasing defendants' negligence from 40% to 100%;
4. In reducing plaintiff's comparative negligence from 60% to 0%; and
5. In increasing the award for Mrs. Scott from $330,000 to $450,000.
Relative to appellants' first contention, defendants wanted to introduce in evidence a diagram drawn by Mrs. Scott at the time her deposition was taken. The court refused because the drawing was not done to scale. The document is in the record by means of a proffer. The court concluded the diagram was deceiving, not only to the jury, but to anyone who might look at it.
The diagram purports to show that plaintiff had an ample alternative to walk in the hallway without walking into the "Wet Floor" sign.
Appellant also complains of the court's failure to permit introduction of the incident report as to what Mrs. Scott told Nurse Holmes within minutes of the incident. That document indicates Mrs. Scott knew the floor was wet with soap. Accordingly, appellant contends that contradicts her testimony that she did not know the floor was wet at the time of the accident.
Appellant claims this is a business document, that a proper foundation was laid *174 for its introduction and that it calls into question plaintiff's credibility.
We find no merit in these contentions. The trial court explained it refused to admit the diagram because it was not to scale and would tend to be confusing. The judge refused to admit the nurse's report because he would allow the witness to testify with respect to her report and permit her to refresh her memory from the report, if necessary.
What defendants intended to show from the report was that Mrs. Scott knew the floor was wet before she fell. The nurse testified fully on that point. She stated while Mrs. Scott told her she knew the floor was wet, the nurse did not know if she meant she knew before or after she fell. The report does not indicate the answer to that question and the nurse who was questioned at length on that point did not know the answer. She had not asked that question of plaintiff at the time of the accident.
Under Louisiana law the trial court is granted wide discretion in assessing the probative value of evidence. City of Baton Rouge v. Tullier, 401 So.2d 422 (La. App. 1st Cir.1981), writ denied 406 So.2d 605 (La.1981); Owens v. Thornton, 349 So.2d 431 (La.App. 4th Cir.1977).
In addition, decisions of a trial court relative to the admission of evidence will not be disturbed on appeal in the absence of manifest error. City of Baton Rouge v. Tullier, supra.
The judge's reasons fully support his refusal to admit the documents in evidence. However, since the documents are in the record by means of proffer we have reviewed them and we find no error in the judge's ruling.
Relative to appellants' second contention, the owner or operator of a premises is obligated to keep the premises free from dangers, traps or pitfalls which are not known to an invitee or which would not be observed by an invitee in the exercise of ordinary care. Rachal v. Brookshire Grocery Stores, Inc., 336 So.2d 1014 (La.App. 3rd Cir.1976); Newell v. Zurich Insurance Co., 325 So.2d 745 (La.App. 1st Cir.1976). These cases also indicate the owner or operator has a duty to warn of a defect that is not readily discernable in the exercise of ordinary care.
Under Louisiana law when a plaintiff proves he or she slipped and fell in a business establishment on a foreign substance or on a wet, damp or slippery floor, the burden of proof shifts to the defendant to exculpate itself from the presumption that it was negligent. Carollo v. Shoney's Big Boy Enterprises, Inc., 433 So.2d 803 (La.App. 5th Cir.1983). The business must establish that it was free from fault and that it exercised reasonable care to protect visitors from foreign substances on the floor. Carollo v. Shoney's Big Boy Enterprises, Inc., ibid; Kavlich v. Kramer, 315 So.2d 282 (La.1975). What is relevant in each case is that a reasonable effort is made to insure the patrons' safety under the circumstances. Hanzo v. Travelers Ins. Co., 357 So.2d 1346 (La.App. 4th Cir. 1978). The owners of a business which permits the public to enter their establishment have a duty to exercise reasonable care to protect those who enter.
This duty extends to keeping the premises safe from unreasonable risks of harm and to adequately warn potential victims of the existence of danger. Miguez v. Urban Developments, Inc., 451 So.2d 614 (La.App. 5th Cir.1984); Jones v. Recreation and Park Commission, etc., 395 So.2d 846 (La.App. 1st Cir.1981).
Since plaintiff slipped and fell on the foreign substance, defendant had the burden of proof to show that it adequately warned plaintiff of the danger.
The hospital employees knew the floor in Room 225 was being stripped with a dangerous substance, thus it was their responsibility to warn the invitees of the danger and to prevent the substance from causing harm. Apparently the jury concluded the one sign in the doorway was sufficient and that plaintiff should have seen the sign.
*175 However, the evidence is overwhelming that the hallway was cluttered with furniture and equipment including appliance cords, the sign was facing into the room at a low level and the substance was not only in the room but some was also in the hall.
The trial court gave ample reasons for rendering judgment notwithstanding the verdict on the issue of liability and we believe the record strongly supports his findings.
Mrs. Scott was on her way to the nurses' station to seek medical help for her daughter as she had been requested to do when the daughter awakened. She had a right to expect the hall to be free and clear of all encumbrances and safe to traverse. We agree with the trial court that she did nothing other than walk naturally and that she was not adequately warnedif she was warned at allof the danger. We agree there was no negligence on her part and that there was 100% fault on the part of the hospital.
Under Louisiana law an employer is liable for the negligent acts of his employees committed in the course and scope of their employment. LSA-C.C. art. 2320; Blanchard v. Ogima, 253 La. 34, 215 So.2d 902 (1968).
As to appellants' third and fourth contentions, for the reasons previously explained we agree with the trial court's granting of judgment notwithstanding the verdict on the issue of liability and finding the hospital 100% negligent. LSA-C.C.P. art. 1811(F) provides the motion for judgment notwithstanding the verdict may be granted by the trial judge on the issue of liability or on the issue of damages or on both issues. It is appropriately entered when the court concludes the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable men could not reach a contrary verdict on the facts at issue. Robertson v. Penn, 472 So.2d 927 (La.App. 1st Cir.1985); Bickham v. Goings, 460 So.2d 646 (La.App. 1st Cir. 1985); Courtney v. Winn-Dixie Louisiana, Inc., 447 So.2d 504 (La.App. 5th Cir. 1984); Arnone v. Illinois Central Gulf Railroad, 461 So.2d 325 (La.App. 1st Cir. 1984).
Nor do we find merit in appellants' fifth contention, that the court erred in increasing the damages. The jury award of $50,000 to the husband for loss of consortium and services was not disturbed by the trial court and is not contested by the defendants. It is amply supported by the evidence. However, the jury award to the wife of $330,000 was increased by the trial court to the sum of $450,000. The jury verdict was an in globo award covering all elements of damages: pain and suffering, lost wages, medical expenses, past, present and future damages.
The trial court itemized its damages as follows:

Past Medical Expenses $ 45,000
Past Lost Wages 20,000
Future Lost Earning Capacity 100,000
Future Medical and Psychiatric
 Expenses 85,000
General Damages 200,000
 ________
 $450,000

The appellants argue, first, that plaintiff was not entitled to any award for loss of wages because she was not employed at the time of the accident and because her future employment was questionable due to prior medical problems unrelated to this accident.
Regarding her employment history, Mrs. Scott testified that during most of her marriage she was too busy to work because she was caring for the couple's nine children. (Three of the children were hers and six of the children were his from prior marriages.)
After the children were grown she worked at a Dollar Store years ago (she did not remember the date). She worked in the Sheriff's Office for six months in 1980. In September of that year she accepted employment with Delta Management as an apartment manager in their Lancelot Square Property. She received a salary of $1,000 per month, free rent, phone and utilities, and a car allowance of $175 per *176 month to drive between the two complexes which she was managing.
In December 1981 plaintiff contracted hepatitis and was hospitalized. After her discharge she requested a leave of absence to recuperate, but her position had been filled and she has not worked since that time. She would like to go back to work at the Sheriff's Office. She has made no applications anywhere else since December 1981.
Her personnel records from the Sheriff's Office indicate that during her six months of employment she was sick and had to take time off for that reason. She filed a claim for sickness and when her sick leave ran out she "retired." This illness was prior to her accident here (October 27, 1982).
She had sustained a ruptured disc in the 1970s in a fall from a ladder and as a result had undergone two operations, the second in 1978. At that time she suffered pain in her legs due to the back injury, depression, and sexual difficulties. She asserts she has suffered further depression and sexual difficulties as a result of this accident. She testified she and her husband have a warm loving relationship and he has been very helpful in guiding the physical therapy she performs at home. He does all the housework since she cannot get around due to her present knee injury.
It is clear that plaintiff will be unable to return to any kind of work in the future. We do not agree, however, with the appellants' contention that her prior health problems indicate she would not have returned to work regardless of the fall in the hospital. We conclude, rather, that trial judge properly found she would have returned to work.
The trial court awarded Mrs. Scott $20,000 for past loss of wages, based upon her apartment-manager job. As stated above, her termination had been due to hepatitis. At the time of her fall in the hospital, she had been unemployed for over six months. The judge obviously concluded, however, not only that Mrs. Scott intended to return to work but that it was probable she would have returned to managing apartments or a job at a similar salary if not for the hospital slip-and-fall.
The itemized award for future loss of earning capacity was also based on the apartment-management job, including salary, free rent, utilities, phone and gas allowance. We point out, moreover, that the future lost wages awarded by the court were approximately one-half the amount her expert witness calculated she could have earned. Accordingly, we cannot find the trial court manifestly erroneous in awarding these amounts for past and future loss of earnings.
The appellants next challenge the award of $85,000 for future medical and psychiatric expenses, asserting there is little evidence concerning the need for future medical expenditures. (Plaintiff's past medical expenses were proven to be $45,000. There is ample evidence to support that award.)
A psychiatrist and a psychologist both recommended that plaintiff continue her weekly psychiatric sessions at $90 per session. Plaintiff's expert economist calculated her future psychiatric expenses at $175,316 for weekly sessions, $40,456 if she only went once a month.
Because plaintiff suffers vascular and orthopedic complications as a result of procedures relating to the injury she suffered in the fall it is reasonable to project she will require future medical care for these problems, considering the testimony of the medical experts. The trial judge pointed out that plaintiff's future medical expenses could amount to over $200,000. Thus, he considered the $85,000 he awarded to be fair in light of the foreseeable variables. We find his conclusion reasonable and not clearly wrong, nor was the amount an abuse of discretion.
Since the jury award was in globo, we do not know what portion of the award was for pain and suffering, lost wages or loss of future earning capacity, or medical expenses. The size of the award indicates *177 that the jury took all of those things into consideration and that the total award reflects this. It also reflects the serious injury resulting from the accident and the way the knee injury has affected plaintiff's other physical problems.
Following her fall and emergency treatment immediately thereafter, she was seen by Dr. Ralph J. Gessner, an orthopedic surgeon, who became her treating physician. Her symptoms did not respond to conservative care, and she was hospitalized for an arthroscopic examination. It was determined that she had chondromalacia of the patella directly related to the accident. She underwent major surgery on the left knee on January 7, 1983 and was hospitalized until January 14, 1983. Because of complications, vascular specialists were consulted and plaintiff was admitted to Hotel Dieu on an emergency basis for thrombophlebitis. Doctors Scgramel, Race and Steploch were the vascular surgeons consulted. Doctors Gessner and Race concluded the thrombophlebitis was a complication secondary to the knee surgery of January 7, 1983. Plaintiff was hospitalized for conditions relating to the accident on six occasions between the date of the accident and the date of trial 2½ years later. Three of the procedures were for orthopedic reasons and three involved treatment of problems associated with vascular difficulties and/or thrombophlebitis.
Unfortunately procedures to improve the knee cause problems with her vascular condition, and treatment that would improve the vascular problem interfere with improvement of her knee. The doctors recognize this as a "no win" situation. They recognize that plaintiff is not a malingerer, and that she and her husband are doing everything possible in the line of therapy recommended. This therapy is done at her home by her husband under the direction of the doctors.
There is no question that plaintiff is permanently disabled as a result of this accident, and the judge and the jury were clearly aware of this, based upon the size of their awards. The trial court itemized its award for general damages as $200,000, and the jury award of $330,000 clearly includes a sizeable amount for general damages.
We conclude that judgment notwithstanding the verdict was properly granted on both liability and damages. The facts and inferences point so strongly and overwhelmingly in favor of the plaintiff that the judge properly concluded reasonable men could not reach a contrary verdict as to quantum. The jury's award plainly was insufficient under the evidence to compensate the plaintiff for all the economic loss and pain she has suffered and can be expected to suffer as a result of this accident. The trial court properly granted judgment notwithstanding the verdict on the issue of damages. Nor were the amounts he awarded an abuse of his discretion.
For the reasons assigned, the judgment is affirmed.
AFFIRMED.