577 So.2d 80 (1990)
Beatrice G. LILLY and Curtis H. Lilly
v.
ALLSTATE INSURANCE COMPANY, et al.
No. CA 89 1527.
Court of Appeal of Louisiana, First Circuit.
December 18, 1990.
Rehearing Denied February 13, 1991.
Writ Denied April 11, 1991.
Iddo Pittman, Jr., Hammond, for plaintiffs.
*81 Adrianne L. Baumgartner, Covington, for State Farm.
Before LOTTINGER, SHORTESS and CARTER, JJ.
LOTTINGER, Judge.
In this personal injury suit, Mrs. Beatrice Lilly and her husband, Mr. Curtis Lilly, seek damages for injuries sustained by Mrs. Lilly in an auto accident which occurred on March 30, 1985.
After a jury awarded the Lillys zero damages, the trial court granted the plaintiff's motion for judgment notwithstanding the verdict and awarded the Lillys $35,000.00 in general damages for Mrs. Lilly's injuries, subject to $20,000.00 already received, and $7,500.00 for Mr. Lilly's loss of consortium.[1]
State Farm Mutual Automobile Insurance Company, the Lillys' uninsured motorist carrier and sole defendant at trial, filed the instant appeal, asserting that the jury considered the $20,000.00 received by the plaintiffs and returned a zero verdict because it felt that $20,000.00 was sufficient compensation. State Farm asserts that this amount was well within the jury's discretion and the trial court erroneously granted the JNOV and substituted its judgment for that of the jury.
The Lillys have answered the appeal asking that the awards to Mr. and Mrs. Lilly be increased to $10,000.00 and $100,000.00, respectively.[2]

FACTS
The accident occurred when a vehicle operated by Ms. Carla Owens ran a stop sign and collided with the vehicle operated by Mrs. Lilly. The Lillys' vehicle was damaged and Mrs. Lilly sustained substantial injuries. She was transported to the local hospital emergency room by Mr. Lilly[3] where she was treated and released.[4]
The Lillys' vehicle was promptly repaired at no cost to the Lillys. However, several months after the accident most of the medical bills remained unpaid and the Lillys' had not received any compensation for Mrs. Lilly's injuries. The Lillys retained counsel in November of 1985, and State Farm finally paid Mrs. Lilly's outstanding medical bills of $817.77 on December 31, 1985 under the medical payments portion of its policy.
The Lillys filed suit on February 11, 1986 against Carla and Richard Owens, the driver and owner of the other vehicle respectively; Allstate Insurance Company, the Owens' insurer; and State Farm, the Lillys' uninsured motorist carrier. On March 23, 1987, Allstate paid its liability limits of $10,000.00 under the Owens' policy to the Lillys and the claim against Allstate and the Owens was dismissed. On July 3, 1987, State Farm made an unconditional tender of $10,000.00, which the Lillys accepted.
At trial, liability was stipulated and the only issues were quantum and whether State Farm had been arbitrary and capricious *82 in failing to pay Mrs. Lilly's medical bills promptly and in failing to make a timely tender under the uninsured motorist provisions of its policy. It was also stipulated that the Lillys had received $10,000.00 from Allstate and $10,000.00 from State Farm.
The plaintiffs' attorney told the jury in his opening and closing statements that the plaintiffs felt they were entitled to more than $20,000.00, and it was the jury's job to decide how much more and award it to them.
The trial judge did not mention the $20,000.00 previously paid to the plaintiffs in the jury charge. He explained the applicable law to the jury, then instructed them that they were to decide how much damages, if any, the Lillys were entitled to. The trial judge then went over the jury interrogatory form with the jury and instructed them that as to the spaces for dollar amounts "[e]ach and every line should be filled in, with some amount, either zero or some other dollar amount, but each and every line should be filled in."
The jury returned its verdict on the jury interrogatory form provided by the trial court as follows:
1. List, in dollars, the total damages, if any, sustained by Beatrice Lilly.

(a) Past Pain and Suffering $ 0
 _____
(b) Future Pain and Suffering 0
 _____
(c) Physical Disability 0
 _____
(d) Past Medical Expenses 0
 _____
(e) Future Medical Expense 0
 _____
 TOTAL (sum of a-e) $ 0
 _____

2. List, in dollars, the total amount of damages, if any, sustained by Curtis Lilly for loss of consortium.
$ 0
3. Do you find that State Farm acted arbitrarily, capriciously, and without probable cause as relates to the payment of medical expenses?
YES X NO_____
4. If your answer to (3) is yes, what amount, if any, do you award to the plaintiffs in payment of attorney's fees incurred for the collection of medical expenses due?
$1,000.00
5. Do you find that State Farm acted arbitrarily, capriciously, and without probable cause as relates to the payment of underinsured motorists benefits?
YES___ NO X
6. If your answer to question 5 is yes, what amount, if any, do you award to the plaintiffs as attorney's fees for the collection of underinsureds motorist's benefits?
$ 0
The judgment signed by the trial court following this verdict was in favor of the plaintiffs and against State Farm as to liability, but held that the plaintiffs had suffered no damages, past or present, as a result of the accident. This judgment also held that State Farm had been arbitrary and capricious in its failure to pay plaintiff's medical bills timely, but not with respect to paying the uninsured motorist claim, and awarded $1,000.00 in attorney's fees and $250.00 in expert witness fees to the plaintiffs.[5]
Both the plaintiffs and the defendant moved for a judgment notwithstanding the verdict. The plaintiffs asserted that it was obvious that the plaintiffs had suffered some amount of damages, and therefore the jury's verdict was clearly erroneous and a JNOV was warranted.
State Farm argued that the jury considered the $20,000.00 previously received from the defendants and decided that was a sufficient amount to compensate the plaintiffs for their damages, and thus awarded zero damages to the plaintiffs. In support of this State Farm cited the plaintiffs' attorney's argument to the jury that *83 $20,000.00 was not enough to compensate the plaintiffs and that they should award damages to the plaintiffs based on whatever figure they decided was appropriate, minus the $20,000.00. State Farm asked for a JNOV awarding the plaintiffs $20,000.00 and giving the defendant credit for $20,000.00 already received by the plaintiffs.
The trial court granted the motions for judgment notwithstanding the verdict on the grounds that the verdict of zero damages was clearly contrary to the law and evidence. The trial court then entered judgment awarding Mrs. Lilly $35,000.00 in total damages subject to the $20,000.00 already paid, and awarding Mr. Lilly $7,500.00 in damages for loss of consortium. This judgment allowed the award of $1,000.00 for attorney's fees to stand, but made no mention of the award for expert witness fees.
State Farm filed the instant appeal contending that the jury was fully aware of the $20,000.00 received by the plaintiffs, and that they took this into consideration when they returned the verdict of zero damages. State Farm further contends that $20,000.00 is reasonable compensation for the injuries suffered by plaintiffs and therefore the jury did not abuse its discretion in returning an award of zero damages, and the JNOV was improperly granted.

JUDGMENT NOTWITHSTANDING THE VERDICT
A judgment notwithstanding the verdict may be granted by a trial court only when the facts and evidence are so strongly and overwhelmingly in favor of the moving party that reasonable men could not have arrived at a contrary verdict, and not merely when the preponderance of the evidence favors the mover. Adams v. Security Insurance Company of Hartford, 543 So.2d 480 (La.1989); Scott v. Hospital Service District No. 1 of the Parish of St. Charles, 496 So.2d 270 (La. 1986); Robertson v. Penn, 472 So.2d 927 (La.App. 1st Cir.), writ denied, 476 So.2d 353 (La.1985). Stated simply, a trial court can grant a JNOV only when a jury's verdict is one which reasonable people could not have rendered; if reasonable persons could have arrived at the same verdict given the evidence presented to the jury, then a JNOV is improper.
In the instant case, liability was stipulated and a JNOV was granted only with respect to quantum. A JNOV is the correct procedural device to raise or lower an unreasonably low or high damage award, La.Code Civ.P. art. 1811(F); Robertson, 472 So.2d at 929; therefore, whether it was proper in the instant case turns on whether or not the verdict was one that a reasonable jury could have reached. In other words, taking into consideration that the plaintiffs in the instant case had already received $20,000.00 from the defendants, was it a clear abuse of the jury's much discretion to award zero damages.
The Louisiana Supreme Court set out the standard for determining whether or not a damage award is reasonable, or within the jury's much discretion, in Reck v. Stevens, 373 So.2d 498 (La.1979). Although Reck dealt with the standard of review to be used by an appellate court to determine the adequacy of a trial court's damage award, the same standard applies to a trial judge's determination of the adequacy of a jury's verdict as to damages. Robertson, 472 So.2d at 933.
In Reck the supreme court held that before an award can be questioned as inadequate or excessive, the individual circumstances of the particular case must be examined, and only after it is determined that the award is inadequate or excessive given the peculiar facts of that case, may resort be had to prior similar cases. 373 So.2d at 501.

THE PLAINTIFFS' INJURIES
A few days after Mrs. Lilly was treated and released from the emergency room on the day of the accident, she went to see Dr. Larry Ferachi, an orthopedic surgeon. Dr. Ferachi testified that he first saw Mrs. Lilly on April 3, 1985. On that initial visit Mrs. Lilly was complaining of pain in her right leg and ankle and bruises on her chest.
*84 Dr. Ferachi's examination of the right knee revealed that it was grossly swollen and bruised on the lateral aspect (the outside of the right knee). X-rays revealed a non-displaced fracture of the joint surface of the lateral tibial plateau. Dr. Ferachi explained that this was a fracture of the knee joint and that non-displaced means that the bone was still in the proper position but had a fracture in it. He explained that this is not as serious as a displaced fracture.
Dr. Ferachi prescribed analgesic pain medication and range of motion exercises for the knee, and ordered Mrs. Lilly not to put any weight on the knee as this might cause the fracture to become displaced. He also prescribed the use of a walker so Mrs. Lilly could get around.
Mrs. Lilly next saw Dr. Ferachi on April 12, 1985. By this time her ankle had completely healed and she had no further complaints about it. However, Dr. Ferachi testified that Mrs. Lilly was complaining of quite a bit of pain in the pelvic and chest areas due to the bruises she had there. X-rays of both of those areas were negative, indicating no broken bones. X-rays of the right knee showed that the fracture was still non-displaced. Dr. Ferachi did not put a cast on the knee because he felt it was best to keep it flexible and free to move so it would not stiffen up. He again prescribed knee exercises, which he testified would at first be painful.
Mrs. Lilly next saw Dr. Ferachi on May 10, 1985. The doctor testified that at that time she was doing quite well and could move her knee through its full range of motion. X-rays continued to show no displacement of the fracture, and Dr. Ferachi advised Mrs. Lilly to start gradually putting weight on the knee. He suggested that Mrs. Lilly begin a gradual discontinuance of the walker in favor of a walking cane.
Mrs. Lilly saw Dr. Ferachi again on May 31, 1985. The X-rays again looked good and showed no displacement of the fracture. Dr. Ferachi testified that at that time Mrs. Lilly was experiencing swelling in both of her legs, but that this condition was not related to the fracture of her knee but rather to a heart condition unrelated to the accident.
Mrs. Lilly next saw Dr. Ferachi on June 21, 1985. Dr. Ferachi testified that Mrs. Lilly had no significant complaints about her knee at that time and that she had a full range of motion in the knee. Physical therapy was prescribed and Dr. Ferachi received a report from the physical therapist on July 25, 1985 which indicated that Mrs. Lilly was progressing nicely after six sessions.
Mrs. Lilly next saw Dr. Ferachi on July 26, 1985. The doctor testified that Mrs. Lilly still had some pain in her knee at that time but it was not severe and more like a discomfort than pain. Dr. Ferachi told Mrs. Lilly that she could now put all of her weight on the knee, and that he was discharging her from his care as far as the knee fracture. He discussed the possibility of degenerative arthritis developing at the site of the fracture and explained that this is a possibility anytime there is a fracture in a joint and is not related to age.
Mrs. Lilly saw Dr. Ferachi again on October 2, 1985. This visit was mainly just for a check-up, but Mrs. Lilly did complain about an occasional aching in the knee joint. Dr. Ferachi advised that she was probably beginning to develop arthritis in the knee at the site of the fracture.
Mrs. Lilly saw Dr. Ferachi again on February 21, 1986. She was complaining of a new pain in her knee. X-rays showed a minimal arthritic change in the knee joint and Dr. Ferachi prescribed Naprosyn for the arthritis.[6] Dr. Ferachi testified that the minimal arthritis evident in these x-rays had not progressed as of the time of trial, and there was no way to tell one way or the other if it would progress or not. Dr. Ferachi further testified that arthritis is a permanent condition that can only get worse and never better.
*85 Mrs. Lilly saw Dr. Ferachi again on November 12, December 3, and December 29, 1986. Although these three visits were unrelated to her knee problems[7] Dr. Ferachi examined the knee on these occasions and reported that it was doing well. Mrs. Lilly was continuing with her knee exercises and had no complaints about her knee except for occasional arthritic aches. Dr. Ferachi changed Mrs. Lilly's prescription from Naprosyn to Nalfon for the arthritis in her knee and shoulder on the first of these three visits.
Mrs. Lilly saw Dr. Ferachi again on April 6, 1987. He testified that except for an occasional catching of the knee joint due to the arthritis that her knee was doing fine. He continued her on the Nalfon for her knee and shoulder.
Mrs. Lilly next saw Dr. Ferachi on August 3, 1987. Dr. Ferachi testified that Mrs. Lilly was complaining of renewed pain in the knee joint at the site of the fracture. He discussed with Mrs. Lilly the possibility of orthoscopic surgery if the arthritis gets worse, but could find no evidence of change and decided that surgery was not warranted at that time. On cross examination by defense counsel Dr. Ferachi testified that this visit was subsequent to his deposition being taken by the defendants at which Mrs. Lilly was present.
Mrs. Lilly saw Dr. Ferachi again on February 29, 1988. At this time she was still having minimal problems with the knee joint. X-rays continued to show minimal arthritis in the knee but range of motion was good and the knee showed no signs of instability. Mrs. Lilly was advised to continue exercising the knee and taking Nalfon as needed.
Mrs. Lilly saw Dr. Ferachi for the last time prior to trial on April 25, 1988. She complained that she was still having problems with the knee and that it occasionally felt like something was catching in the joint. Dr. Ferachi explained that this was a symptom of the arthritis and again discussed the possibility of surgery on the knee with Mrs. Lilly should the arthritis worsen. Finding basically no change in the knee Dr. Ferachi did not believe that surgery was warranted and none was performed.
Dr. Ferachi testified that in his opinion Mrs. Lilly would continue to experience some pain in her knee after standing or walking for long periods due to the arthritis in her knee which resulted from the fracture. Dr. Ferachi testified that the arthritis may or may not get worse but that it would not get better and it is a permanent condition. In his opinion Mrs. Lilly suffers a ten percent disability of her right leg due to the minimal arthritis present in the knee.
Mrs. Lilly testified that she was laid up in bed for nine weeks following the accident and that she still has pain in her knee when she puts weight on it. She testified that her knee hurts for about a half an hour every morning and that by the afternoon she must get off her feet because her knee starts to hurt.
Mr. Lilly testified that he had to take care of his wife during the nine weeks she was in bed and also acted as cook and housekeeper during this time, duties that Mrs. Lilly normally had. Mr. Lilly also testified that Mrs. Lilly used to help with the yard work and that now he has to do it alone. Mr. Lilly further testified that they had to cancel a trip to France that they had planned due to the accident. This trip was for Mr. Lilly's fortieth reunion of his World War II squadron, and that although they had a reunion every year here in the United States, that this one would have been special because it was in France, where the squadron had been stationed during the war.

CONCLUSION
Considering the nature and extent of Mrs. Lilly's injuries, and the effect that these injuries had, and still have, on her, together with the loss of consortium claim *86 on behalf of Mr. Lilly, we cannot say that it was an abuse of the jury's great discretion to award zero damages, given the fact that the Lillys had already received $20,000.00. A jury's assessment of damages will not be set aside unless it is found that it abused its much discretion. Since we cannot say that the evidence points overwhelmingly to an abuse of the jury's discretion, or to its application of incorrect legal standards as to quantum, the jury's apparent assessment of the Lillys' damages at or below $20,000.00 was one which reasonable persons could have made. Therefore, the trial court erred in granting the judgment notwithstanding the verdict.

THE ANSWER TO THE APPEAL
The Lillys' have answered the appeal of State Farm asking that the awards to Mr. and Mrs. Lilly be increased to $10,000.00 and $100,000.00 respectively. The quantum of damages was all that the Lillys' complained of in their answer to the appeal, and in it they specifically prayed that the remainder of the judgment be affirmed.
Since we have already concluded that the jury did not abuse its discretion in awarding zero damages, i.e. that $20,000.00 was a reasonable amount of damages, we must deny plaintiffs' request to increase the award.
The plaintiffs also ask in their brief that State Farm be held liable for penalties for its failure to pay the medical bills timely, and for penalties and attorney's fees for failing to make a timely tender under the uninsured motorist portion of its policy, pursuant to La.R.S. 22:658, and for penalties and attorney's fees for filing a frivolous appeal pursuant to La.Code Civ.P. art. 2164.
An answer to an appeal only operates as an appeal from those aspects of the judgment of which the answer complains. Weber v. Buccola-McKenzie, Inc., 541 So.2d 315 (La.App. 5th Cir.1989); Liedtke v. Allstate Insurance Company, 405 So.2d 859 (La.App. 3rd Cir.), writ denied, 407 So.2d 748 (La.1981); Story v. Martin, 217 So.2d 758 (La.App. 4th Cir.1969). Therefore, since the Lillys have not requested any other relief except an increase in quantum in their answer to State Farm's appeal, we are powerless to grant these requests even if they were meritorious, a question which we do not decide.[8]

DECREE
Therefore, for the above and foregoing reasons, the judgment notwithstanding the verdict rendered by the trial court is hereby vacated, and the original judgment awarding the plaintiffs zero damages plus $1,000.00 in attorney's fees and $250.00 in expert witness' fees is reinstated. The costs of this appeal are to be borne by the plaintiffs.
REVERSED: THE JURY VERDICT IS REINSTATED.
SHORTESS and CARTER, JJ., concur in the result.
NOTES
[1] The jury, aware of the fact that the Lillys had already received $20,000.00 from the defendants, awarded no damages for Mrs. Lilly's past and future pain and suffering, past and future medical expenses, or physical disability, and no damages for Mr. Lilly's loss of consortium. The jury did find that State Farm had been arbitrary and capricious in its failure to timely pay Mrs. Lilly's medical bills, but not in its handling of the Lilly's uninsured motorist claim, and awarded $1,000.00 in attorney's fees. The trial court let the award of attorney's fees stand in its judgment notwithstanding the verdict.
[2] The Lillys also ask in their brief that State Farm be assessed the statutorily imposed penalty for being arbitrary and capricious with regard to paying the medical bills, that State Farm be assessed penalties and attorney's fees for failing to pay the uninsured motorist claim timely, and that State Farm be assessed penalties and attorney's fees for filing a frivolous appeal.
[3] Mr. Lilly was at home at the time of the accident. Shortly after it had occurred he was notified by telephone that his wife had been in an accident and he immediately went to the scene. He then transported his wife to the emergency room.
[4] At the emergency room, Mrs. Lilly had her right leg X-rayed, was given a tetanus shot, and had a one inch laceration on her forehead bandaged. Because the X-rays indicated a fractured knee and sprained ankle, Mrs. Lilly was fitted with a temporary knee brace, or cast, and advised to see an orthopedic surgeon.
[5] Although the jury found that State Farm had been arbitrary and capricious in failing to pay the plaintiff's medical bills within sixty days, and, pursuant to La.R.S. 22:658, awarded one thousand dollars in attorney's fees to the plaintiffs, neither the original judgment nor the judgment notwithstanding the verdict awarded the penalties allowed by the statute. Since neither party has appealed this aspect of the judgment, it is now final.
[6] Mrs. Lilly had previously been prescribed Naprosyn for arthritis in her wrist and hip and testified that she used it already whenever her arthritis flared up.
[7] Mrs. Lilly hurt her shoulder during a jazzercise class and apparently developed arthritis in her shoulder as a result.
[8] We note, however, that since State Farm has prevailed in its contention that the JNOV was improperly granted, it is highly unlikely that we would find its appeal to be frivolous.