712 So.2d 120 (1997)
Peter DAYE, as Provisional Tutor of the Minor, Samuel Goodwin, Plaintiff-Appellee,
v.
GENERAL MOTORS CORPORATION, et al., Defendant-Appellant.
No. 29118-CA.
Court of Appeal of Louisiana, Second Circuit.
May 21, 1997.
Writ Granted October 10, 1997.
Writ Denied October 10, 1997.
*122 Hudson, Potts & Bernstein by Jesse McDonald, Monroe, Lunn, Irion, Johnson, Salley & Carlisle by Charles Salley, Shreveport, Bernard, Cassisa & Elliott by Howard B. Kaplan, Metairie, for Defendant-Appellant General Motors Corporation.
Bodenheimer, Jones, Klotz & Simmons by Harry D. Simmons, Shreveport, for Defendant-Appellant Courtesy Chevrolet.
Wiener, Weiss, Madison & Howell by James F. Howell and Jeffrey Weiss, Shreveport, for Plaintiff-Appellee.
Before NORRIS, BROWN, WILLIAMS, GASKINS and CARAWAY, JJ.
Defendant's Writ Granted October 10, 1997.
Plaintiff's Writ Denied October 10, 1997.
CARAWAY, Judge.
In this personal injury case, sixteen-year-old Samuel Goodwin was seriously and permanently injured in September of 1986 when he lost control of his 1986 Corvette after he braked the vehicle while traveling through a curve of a highway. Following a trial held nine years later, the jury found that Goodwin was 75% at fault, and that the defendant car manufacturer, General Motors ("GM"), was 25% at fault due to negligent misrepresentations regarding the vehicle. The trial court granted the plaintiff's motion for Judgment Notwithstanding the Verdict ("JNOV") regarding the jury's assessment of fault and rendered judgment assessing GM with 75% fault and the plaintiff with 25% fault. GM appeals, urging that the trial court should not have granted the JNOV, and that the jury erred in concluding that the plaintiff had carried its burden of proof that GM negligently misrepresented the capabilities of the vehicle. Rejecting GM's latter contention, we reverse the judgment of the trial court, reinstate the jury verdict and the prior judgment rendered in accordance therewith.

Facts
John Goodwin purchased a 1986 Corvette for his son, Sam Goodwin, in November of 1985. Sam was sixteen years old and an eleventh grade high school student. The car was equipped with an anti-lock braking system ("ABS"), which was introduced that year by General Motors exclusively in Corvettes. GM advertised ABS brakes on the Corvette as a safety feature in several automobile magazines as well as GM's publications, the Corvette News and the Corvette Catalog, touting that they would not "lock-up" under emergency breaking situations. Goodwin testified that he had read all the information he could on Corvettes, including the information contained in the automobile magazines, the advertisements, and the GM Corvette publications. Goodwin testified that he read about the ABS braking system in the Corvette News and Corvette Catalog. After he obtained his Corvette, Goodwin testified that he saw advertisements in automobile magazines such as Road & Track and Car & Driver emphasizing that the Corvette equipped with ABS brakes could be stopped suddenly in emergency braking situations involving curves without the wheel lock-up and *123 loss of control that occurs with ordinary hydraulic brakes. The advertisements further suggested or implied that the speeds which the Corvette was capable of obtaining were less dangerous because of the safety of the ABS system.
Nearly eleven months after obtaining the Corvette, and after putting 27,000 miles on the vehicle, on a Friday evening in mid-September of 1986, Sam Goodwin met with some of his friends at an old camp house on the family property of his friend, Jeff Lynn. The boys were planning to go dove hunting the next day. Around eleven p.m., they became hungry, and Sam and one of the other boys, John Arnold, agreed to go after some hamburgers in Sam's Corvette.
The camp was located on Louisiana Highway 3049, also known as the "Old Dixie Highway." The road is an old country road traversing through lands adjacent to the Red River with few houses, long straight-aways mixed with some curves and cotton fields on both sides. Goodwin was quite familiar with the road, having driven on the road numerous times to visit his friend, Jeff Lynn. In fact, Goodwin had been on the road and the curve where the accident occurred several times that day.[1]
Goodwin testified that, consistent with his past driving practice on this highway, on the night of the accident, he drove the Corvette at speeds up to 95 or 100 miles per hour on a long straight-away of about 5 or 6 miles before reaching "dead man's curve," an extremely sharp curve in the road prior to a one-mile straight-away preceding the accident curve. He stated that when he approached dead man's curve, he decelerated down to about 20 miles per hour and drove safely through the curve as he had done many times in the past. He then accelerated to a speed of about 85 miles an hour on the mile-long straight-away preceding the fateful curve. As he approached the curve, which posts a speed limit of 45 mph, he slowed down to approximately 65-70 miles per hour and proceeded into the curve. He testified that he always drove safely through the curve at 65 miles per hour. On this occasion, however, he decided to slow down even more because it was nighttime. According to Goodwin, he applied the brakes with medium force. When the brakes apparently did not respond, he applied them hard and simultaneously lost control of the car which began to skid. The rear of the vehicle swung around clockwise, sliding sideways off of the road with the passenger side leading, traveling approximately 180 feet along the shoulder of the road and through a fence and underbrush. The vehicle then apparently flipped twice, the last time dropping off the high bluff along the Red River with the car landing on its roof on a sand bar within feet of the water's edge.
Both passengers remained in the vehicle through the crash. The accident broke Samuel Goodwin's back. He is permanently paralyzed from the waist down. His passenger, John Arnold, suffered some minor lacerations.
In bringing this action in 1987, plaintiff initially sued USAA, the insurer of John Goodwin, Sam's father, alleging that Mr. Goodwin negligently purchased the Corvette and allowed his son to use it when it was well known to him that his son had a propensity to speed. USAA obtained a summary judgment dismissing it from the case. Plaintiff also claimed that the brakes on the Corvette were defective[2] and made a general allegation that GM was negligent in marketing the vehicle.[3]
*124 Plaintiff's original petition was later amended twice, reflecting an evolution of the plaintiff's claim against GM. On the record it appears that it was only after a 1993 amendment to the pleadings that the focus of the plaintiff's claim intensified on the representations by GM in its advertisements, catalogs, newsletters and brochures regarding the driving capabilities and safety of Corvettes, particularly the ABS braking system.[4] Also in his amended petition filed on May 10, 1993, plaintiff added as a defendant the State of Louisiana, Department of Transportation and Development ("DOTD"), claiming that the condition of the rough roadway was substandard and this was a cause of the accident.
Plaintiff's final amended petition filed on March 15, 1994 claimed that John Goodwin bought the Corvette based upon representations of its safety by GM and the dealer, Courtesy Chevrolet. Stating that he was traveling at 85 miles per hour prior to approaching the curve where the accident occurred, plaintiff alleged that he then slowed to 65 miles per hour and was operating within the curve at this speed based upon the misrepresentations and exaggerations of GM regarding the capabilities of the vehicle. According to the amended petition, the accident occurred "when the brakes on the 1986 Corvette locked and/or failed to provide sufficient and timely breaking force as the plaintiff was proceeding into the curve, which caused the 1986 Corvette to skid and fishtail across the washboard surface of the roadway, strike a pothole, [and] leave the roadway...."
At trial, the experts on both sides substantially agreed on certain critical facts about the accident. It was generally agreed that it was possible for the Corvette to negotiate the curve in question at a maximum speed of approximately 80 miles an hour. Second, the plaintiff erroneously applied the brakes after the car had begun negotiating the curve so that the added braking load on the tires, combined with the side load from centrifugal force against the tires in the curve, started the vehicle into the out-of-control, sideways slide. Nevertheless, because of the lack of rubber tire markings on the road's surface, the experts' testimony also indicated that the braking during the last 300 to 150 feet before leaving the asphalt did not lock the wheels, thereby preventing rotation through the skid,[5] and the jury was ultimately never asked to conclude that the braking system failed or was defective.
Concerning the actual physical condition of the curve and roadway, the evidence showed that the radius of the curve at the place where plaintiff first applied the brakes was approximately 750 feet and the curve was slightly tighter, approximately 675 feet, at the point where the vehicle left the highway. Mr. Maxwell Dow, a mechanical engineer, reviewed the scene for the plaintiff in October of 1986, six weeks after the accident. In his report reconstructing the accident and in his trial deposition testimony, he described the surface of the southbound lane as having a corrugated, washboard pattern of indentions in the asphalt. He also had noted in 1986 a road sign along the highway north of the curve which stated: "Drive carefully, a substandard roadway." Immediately, to the north of the curve, the roadway sign posted the curve speed limit at 45 miles per hour. Finally, the driver's view in the curve turning to the right was blinded as to any oncoming northbound vehicles by the thick underbrush of the wooded area on the inside of the curve extending to the edge of the narrow shoulder of the blacktop.
*125 After trial, the jury returned a verdict which found both GM and the plaintiff at fault. The jury found that the defendant manufacturer, General Motors Corporation, was 25% at fault in causing the injuries to the plaintiff through negligent misrepresentations.[6] The jury rejected the negligent misrepresentation claim against the vendor, Courtesy Chevrolet, Inc., however, and it also rejected Goodwin's claim that GM had failed to warn about dangers inherent to normal use of the Corvette and the claim that the Corvette was unreasonably dangerous per se. Thus, according to the jury findings, GM's fault was based solely upon the negligent misrepresentations claim for which it was assessed at 25%. The jury found the plaintiff himself 75% at fault and assessed no percentage of fault to the DOTD which had settled with the plaintiff during the course of the trial.
The jury awarded $1,425,000 in general damages, $175,000 in past medical expenses, and $400,000 in future medical expenses, bringing the sum of the award for general and special damages to $2,000,000.
Plaintiff moved for a JNOV as to the jury's allocation of fault, praying that the court reapportion fault at 75% for GM and 25% for the plaintiff. The trial court granted the motion and rendered judgment re-allocating General Motors with 75% fault and the plaintiff with 25% fault, citing the jury's misapplication of the factors for the assessment of comparative fault set out in Watson v. State Farm Fire and Casualty Insurance Company, et al, 469 So.2d 967 (La.1985). The court concluded that, "[a]fter a thorough analysis of the Watson factors ..."
(1) undoubtedly, GM was aware of the danger of distributing advertisements and instructional material condoningand arguably advocatingthe immediate application of brakes in the middle of high radius curves at high speeds. In contrast, sixteen year old Sam Goodwin was not aware of the danger inasmuch as he relied upon and believed those misrepresentations. GM's conduct was intentional as well as reckless. While Sam Goodwin's conduct of exceeding the speed limit by traveling 65 mph was intentional, his application of the brakes consistent with the advices of GM was inadvertent and reasonably foreseeable by GM;
(2) the risk created by GM's misrepresentations was substantial as evidenced by Sam Goodwin's paraplegia;
(3) GM's misrepresentations and intentional wrongful conduct were designed for monetary gain without proper regard to the dangers those misrepresentations created;
(4) GM's capabilities and resources were far superior to those of Sam Goodwin;
(5) other than youth and reliance upon the misrepresentation of GM, there are few extenuating circumstances which justify a driver exceeding the speed limit but there are no extenuating circumstances which justify the misconduct of GM.
Calling GM's actions reprehensible and shameful, the court re-allocated the comparative fault of the parties in the manner stated above.
Defendant GM now brings this appeal asserting that the trial court erred in granting the motion for JNOV, and that the jury erred in finding that the plaintiff carried its burden of proof in the negligent misrepresentation claim.

Discussion

I.
There is very little jurisprudence in this state regarding tort claims arising out of negligent misrepresentation. Most claims for negligent misrepresentation arise in a contractual context. In the context of physical injury to a plaintiff, we have found no Louisiana cases where a plaintiff consumer sued a defendant manufacturer for damages arising out of negligent misrepresentations about the manufacturer's product. Nevertheless, based upon pronouncements from the supreme court discussed below and the breadth of Civil Code article 2315, we find no *126 reason why such a claim could not be made, provided that the plaintiff can show the requisite elements established for such claims.
First, however, GM contends that the information and advertisements disseminated by GM regarding the capabilities of the Corvette is protected by the First Amendment to the United States Constitution as commercial speech, i.e., advertising. We reject this contention in this instance. The "advertisements" in question purport to give the public information regarding safety, handling capabilities and increased ability of the ABS brakes on the Corvette and their safety over and above conventional hydraulic brakes. It has long been recognized that states have a great and far-reaching interest in the safety of its citizens on public highways. Moreover, there is no First Amendment freedom of speech protection of commercial speech if that speech involves false or misleading information regarding the safety of a product, particularly where the state has a great interest. See, e.g., Central Hudson Gas & Electric Corporation v. Public Service Commission, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), wherein Justice Powell stated "[f]or commercial speech to come within that provision, [i.e. the protection of the First Amendment] ... it at least must concern lawful activity and not be misleading."
Thus, Louisiana regulates commercial speech in its protection of the public interest through legislation such as its Unfair Trade Practices and Consumer Protection Law, LSA-R.S. 51:1401 et seq., and through the imposition of liability through its courts. See Gour v. Daray Motor Co. Inc., 373 So.2d 571 (La.App. 3d Cir.1979), writs granted, 376 So.2d 1270, writs dismissed, 377 So.2d 1033 (La.1979), and cases cited therein.
The broad claim of negligent misrepresentation was recognized by the Louisiana Supreme Court in Devore v. Hobart Mfg. Co., 367 So.2d 836, 839 (La.1979); see also National Council on Compensation Insurance v. Quixx Temporary Services, Inc., 95-0725 (La.App. 4th Cir. 11/16/95), 665 So.2d 120. The Devore court cited the Restatement, Second, Torts, § 311, captioned "Negligent Misrepresentation Involving Risk of Physical Harm" in discussing the claim. This section states that:
(1) One who negligently gives false information to another is subject to liability for physical harm caused by action taken by the other in reasonable reliance upon such information, where such harm results
(a) to the other, or
(b) to such third persons as the actor should expect to be put in peril by the action taken.
(2) Such negligence may consist of failure to exercise reasonable care
(a) in ascertaining the accuracy of the information, or
(b) in the manner in which it is communicated.
Louisiana courts have held that to prevail in an action for negligent misrepresentation, the plaintiff must prove that the defendant had a duty to supply correct information, that the defendant breached that duty, and that the defendant's breach caused damages to the plaintiff. Quixx Temporary Services, supra 665 So.2d at 122; Beal v. Lomas and Nettleton Co., 410 So.2d 318, 321 (La.App. 4th Cir.1982).
Thus, in this instance, the plaintiff's burden in its claim for negligent misrepresentation is to show that:
(1) GM had a legal duty to provide correct information regarding the safety, maneuverability, handling and braking abilities of the Corvette;
(2) GM breached its duty by giving false or misleading information, and
(3) These misrepresentations were reasonably relied upon by the plaintiff who was injured as a result thereof.
Based upon our review of the record, we have no difficulty in concluding that GM's assignment of error alleging that the plaintiff failed to carry his burden of proof on the issue of this negligent advertising lacks merit. The law imposes a duty upon manufacturers and vendors who advertise a product to provide correct information regarding their products when such information involves the public welfare and safety. The plaintiff presented a plethora of evidence regarding *127 flagrant misrepresentations in advertising regarding the Corvette's safety in high-speed curves and the increased handling capabilities due to the vehicle's design, suspension and ABS brakes. (See Appendix). Even GM's own representatives at trial admitted on cross examination that GM's ads could be misread and were misleading and that its advertisements inferring that the Corvette could be driven through a curve at twice the posted speed limit was an inappropriate invitation to break the law. Therefore, we conclude that there is no manifest error in the jury's finding that the plaintiff relied on these misrepresentations in a manner which amounted to a substantial cause of this accident.

II.
We now review the law applicable to GM's contention that the trial court erred in granting the plaintiff's motion for a judgment notwithstanding the verdict ("JNOV") with respect to the jury's allocation of fault.
A JNOV is the procedural device authorized by La. C.C.P. art. 1811 whereby the trial court may correct a legally erroneous verdict by modifying fault or damages, or both, that the jury may have assessed. Jackson v. A.L. & W. Moore Trucking, 609 So.2d 1064, 1071 (La.App. 2d Cir.1992); Zeagler v. Dillard Department Stores, Inc., 521 So.2d 766, 769 (La.App. 2d Cir.1988). Article 1811 closely tracks the former language of Rule 50 of the Federal Rules of Civil Procedure[7] and does not itself provide a criteria to be used in determining when a JNOV is proper. This criteria has developed jurisprudentially, however. In tracing this development, we have seen that the Louisiana Supreme Court and the Louisiana appellate courts have often relied upon the federal jurisprudence in their interpretation of our own codal provision. See, e.g., Scott v. Hospital Service District No. 1, 496 So.2d 270 (La.1986)[8]; Willis v. Louisiana Power & Light Co., 524 So.2d 42 (La.App. 2d Cir.1988); Robertson v. Penn, 472 So.2d 927 (La.App. 1st Cir.1985).
In Anderson v. New Orleans Public Service, Inc., 583 So.2d 829, 832 (La.1991), the Louisiana Supreme Court fully set out the criteria to be used by a trial court to determine when a JNOV is proper, and the standard of appellate review of the grant of a JNOV. The Anderson court stated:
A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. Scott, supra. In making this determination, the court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.
On the record before it, the Anderson court, in the same situation as presented here, with the trial judge having granted the JNOV to adjust the allocation of the percentages of fault, then applied this legal test of sufficiency of the evidence, reversing the trial court by holding that "the evidence presented to the jury was of such a conflicting nature that it is impossible to say that reasonable *128 men could not reach different conclusions." Id.
In Jackson v. A.L. & W. Moore Trucking, supra, we restated more concisely the Anderson criteria for granting a JNOV, as follows:
Simply stated, a trial court can grant a JNOV only when a jury's verdict is one which reasonable people could not have rendered; if reasonable people could have arrived at the same verdict given the evidence presented to the jury, then a JNOV is improper. Lilly v. Allstate Insurance Company, 577 So.2d 80 (La.App. 1st Cir. 1990), writ denied, 578 So.2d 914 (La.1991).
Jackson, supra at 1072.
This criteria is identical to that employed by the federal courts, and is known as "The Substantial Evidence or Reasonable Man Test." Boeing Company v. Shipman, 411 F.2d 365, 373 (5th Cir.1969)(en banc).[9] Thus, "a motion for JNOV presents the legal question of whether there is sufficient evidence to support a jury verdict." Commercial Property v. Quality Inns, 61 F.3d 639, 644 (8th Cir.1995)(emphasis ours). In re Letterman Bros. Energy Securities Litigation, 799 F.2d 967 at 972 (5th Cir.1986), cert denied 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987) ("[a] judge's decision to grant a ... judgment notwithstanding the verdict is not a matter of discretion, but a conclusion of law based upon a finding that there is insufficient evidence to create a fact question for the jury.") (citations omitted)(emphasis ours). The motion for JNOV should not be decided by which Inside has the better case. See Boeing Company v. Shipman, at 375. A motion for JNOV may not be granted where there is substantial evidence in the record raising a relevant fact issue for determination by the jury. Calcasieu Marine National Bank v. Grant, III, 943 F.2d 1453, 1460 (5th Cir.1991).
The trial court's decision to enter a JNOV requires the appellate court to review the evidence under a standard different from that usually applied in a civil appeal. Hardin v. Munchies Food Store, 510 So.2d 33 (La.App. 2d Cir.1987), modified, 521 So.2d 1200. In reviewing the JNOV, the appellate court must first determine if the trial court erred in granting the JNOV. Anderson v. New Orleans Public Service, Inc. (NOPSI), supra at 832. This is done by determining "whether the jury verdict is supported by competent evidence and is not wholly unreasonable," which is the same criteria the trial court should have applied. Daigle v. United States Fidelity and Guaranty Insurance Company, 94-0304 (La.App. 1st Cir. 5/5/95), 655 So.2d 431, 435. See also, Anderson, supra at 832 (Appellate court uses the same criteria as the trial court to determine if the trial court properly granted a JNOV). Thus, federal appellate courts have characterized their review of the grant of a motion for JNOV as "de novo" in that the appellate courts again "must view all the facts in the light most favorable to the party against whom the verdict was directed." Thomas v. Stalter, 20 F.3d 298, 301 (7th Cir.1994); see also Crist v. Dickson Welding, Inc., 957 F.2d 1281 (5th Cir.1992), rehearing denied, cert. denied, Dickson Welding, Inc. v. Alexander & Alexander, Inc., 506 U.S. 864, 113 S.Ct. 187, 121 L.Ed.2d 132 (1992). Resolution Trust Corp. v. Cramer, 6 F.3d 1102 (5th Cir.1993); Deus v. Allstate Ins. Co., 15 F.3d 506 (5th Cir.1994), cert denied 513 U.S. 1014, 115 S.Ct. 573, 130 L.Ed.2d 490 (1994); E.E.O.C. v. Louisiana Office of Community Services, 47 F.3d 1438 (5th Cir.1995). Just as the trial judge in considering the motion for JNOV may not substitute or elevate his views on credibility or the inferences from the evidence over other reasonable choices of the evidence which the jury had to weigh, our appellate review of the JNOV, giving no deference to the factual conclusions the trial court may have reached in granting the motion, considers the evidence anew (de novo) resolving all reasonable inferences, factual disputes and credibility evaluations in the light most favorable to the jury's verdict in the determination of whether reasonable people could have reached that verdict.
*129 If, after applying the JNOV criteria in making the de novo review of the record, the appellate court concludes that the motion for JNOV was incorrectly granted, the jury verdict is reinstated and the judgment thereon is subject to manifest error review. On the other hand, if the judgment granting the motion for JNOV is upheld, the appellate court then reviews the entire record under the manifest error standard to determine whether the judgment is reasonably supported by the record. Jackson v. A.L. & W. Moore Trucking, supra at 1072. See also Ventress v. Union Pacific Railroad Co., 95-1240 (La.App. 4th Cir. 12/28/95), 666 So.2d 1210; Daigle v. U.S. Fidelity and Guaranty Ins. Co., supra; Russo v. Bratton, 94-2634 (La.App. 4th Cir. 6/29/95), 657 So.2d 777, writ denied 95-1964 (La.11/13/95), 662 So.2d 474; Higley v. Kramer, 581 So.2d 273 (La.App. 1st Cir.1991).
Because the trial court stated that it granted the JNOV in this instance on the basis of its findings regarding the jury's allocation of fault under the standards set forth in Watson v. State Farm Fire and Casualty Insurance Company, 469 So.2d 967 (La.1985), we next review the criteria for the apportionment of fault enunciated by the Louisiana Supreme Court in that case. In Watson, the plaintiffs brought a wrongful death action against the father of a twelve-year-old boy for the accidental shooting death of Mr. Watson while the boy was deer hunting on the Watson farm. In the twilight of late afternoon, the boy, who had never been taught how to use the weapon or its scope, mistook Mr. Watson for a deer and fired a single fatal shot, striking Mr. Watson in the head and killing him instantly. A jury found that Mr. Watson was 100 percent at fault for failing to wear "hunter orange," which was a violation of LSA-R.S. 56:143.
The supreme court reversed, holding that it was clearly wrong for both of the lower courts to have determined that the victim, Mr. Watson, was the sole party at fault in his own death. The high court apportioned the decedent with 20% fault, and the father and son with 80% of the fault of the accident.
In reaching this conclusion, the court set guidelines for apportioning fault. Quoting the Uniform Comparative Fault Act, 2(b) and Comment, the court stated:
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
Watson, supra at 974. (Emphasis ours).
We add emphasis to point out the two-pronged nature of the inquiry. The now well-recognized Watson factors used in one prong to assess the nature of the conduct that may influence the degree of fault assigned, were stated as follows:
(1) whether the conduct resulted from inadvertence or involved an awareness of the danger,
(2) how great a risk was created by the conduct,
(3) the significance of what was sought by the conduct,
(4) the capacities of the actor, whether superior or inferior, and
(5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought.
With respect to the other prong, the causal relationship between the negligent conduct and the harm, the court further stated that "the relationship between the fault/negligent conduct and the harm to the plaintiff," "as evidenced by concepts such as last clear chance," "are considerations in determining the relative fault of the parties." Watson, supra at 974. After examining the action of the boy in firing the weapon, and the action of Mr. Watson in inadvertently walking unannounced at a distance of 461 feet from the boy's location, the court concluded that Watson's "omissions, at worse, had only an indirect causative impact" while the action of firing the gun or failing to train and supervise the firing of such weapon "had a direct potential for fatal consequences." Id. at 974.

III.
Turning now to the evidence in the instant case and our review of the trial court's grant of the JNOV, when we answer *130 the question of whether there was evidence of such quality and weight that reasonable and fair-minded persons of the jury could have arrived at the same verdict and limited GM's negligent actions to a 25% share of the fault, we think that the focus should be directed to the evidence concerning the manner in which Sam Goodwin could have relied upon GM's misrepresentations on that fateful night. In the absence of proof of Sam Goodwin's knowledge of the GM publications and his reliance thereon, the errors which he made in proceeding through the curve at a high rate of speed and in applying the brakes would be the sole cause of this accident, irrespective of how reprehensible GM's materials. On the other hand, the plaintiff argues that, since it was shown that the Corvette was capable of holding the curve at the speed in question, the braking maneuver, influenced directly by GM's negligent misrepresentations was the overriding cause of the accident.
In this case, the evidence concerning the plaintiff's knowledge and awareness of GM's misleading information was examined, in point of time, at two critical moments. First, in advance of the accident, particularly at the time of the purchase of the Corvette, the evidence showed that Sam Goodwin diligently and enthusiastically studied GM's information about the Corvette in an effort to convince his father concerning the safety of the vehicle, so that his father would make the purchase. With the addition of the new ABS brakes as an improvement over the 1985-model Corvette which he had previously shown his father, Sam Goodwin had another significant feature to attempt to sway his father. After the family's purchase of the vehicle, Sam's study of the information regarding his automobile did not end. He prepared a speech for his high school class regarding the advancements in technology in the Corvette. From his study of this information, the jury could conclude that Sam Goodwin had gained an exaggerated sense of safety from the misleading advertisements and other publications emphasizing the speed, handling and braking ability of the Corvette while driving through any highway curve. Nevertheless, in assessing this significant reliance factor from Sam Goodwin's advance knowledge, perception and recollection of the GM ads, the jury, who heard Sam testify, would have a wide range of choices of the impact of that knowledge upon the mind of a sixteen-year-old.
The next crucial moment concerns the split-second timing regarding the decisions made by the plaintiff as he negotiated the curve on the night in question and the braking maneuver he employed. The evidence contains Sam Goodwin's testimony recounting the events of the crash, along with the reconstruction of the accident by the various experts based upon the evidence left at the scene.
In a significant sequence of questioning at trial, the plaintiff was repeatedly asked on cross-examination whether he applied the brakes while negotiating the curve because of the misrepresentations of the GM advertising. His responses to this line of questioning were as follows:
A. I was coming into town, I believed I was going too fast to be coming into town, coming through that curve, so I put my foot on the brakes, it didn't work, and I mashed on them hard, and they locked up, like they're not supposed to, and the car slid off the road and fell over upside down on an embankment.
* * * * * *
A. Mr. McDonald, I have been telling the jury that I was slowing down because I was coming into town at night and that is why I mashed on my brakes because it was night.
Though these responses can be subject to some degree of interpretation, the jury could hear from these answers that plaintiff believed he was going "too fast" coming through that curve at night. On the other hand, the answers clearly avoided the thrust of the question posed to the plaintiff, and he did not assert in his response that the GM ads caused his reaction at that moment. The answers can be understood as expressions of an impulse to brake in a situation which was just "too fast." The plaintiff's nighttime braking maneuver, instituted as the car was moving at approximately 100 feet per second around the curve, can be viewed simply as *131 the result of his perceived need to slow down. From that perspective, focusing more on the plaintiff's excessive and unlawful speed, the jury could view the braking maneuver as more reflexive in nature, divorced from any cognitive, advertive response at that moment to GM's ABS advertising. Indeed, the trial court in his ruling on the JNOV stated that the plaintiff's "application of the brakes ... was inadvertent."
The reconstructions of the accident of the various experts regarding the cause of the accident are useful in our comparison of the impact of GM's misleading, negligent ads with plaintiff's speeding and braking negligence. Though all the experts admitted that it was possible for the Corvette to have made the curve at approximately 80 miles per hour without the application of the brakes, they did not say that traveling the curve at that speed or at 70 miles per hour[10] was safe. The testimony of Mr. Maxwell Dow,[11] who drove his Oldsmobile around the curve at 55 mph six weeks after the accident, was most revealing:
Q. Would you expect the Corvette to be able to go around that curve without any problems at a speed higher than you could with your Oldsmobile. And if so, how much higher do you estimate, based on your experience?
A. If you do some estimating through the calculation business, and I had a smooth road, the upper limit, I think, was something like 85 to 90 miles an hour. Now there's a terrible road surface, so it becomes a guessing game as to how that Corvette would have handled itself, so I'm saying somewhere between maybe 60 to 75. It's just possible.
Q. For the Corvette?
A. Yes, but it's doubtful because it hinges on the condition of that Corvette at the time; tire hardness, shock absorbers. But to me it's dangerous for any automobile that gets much above 60 miles an hour.
Q. To go around that curve in the direction the Corvette was?
A. Yes.
Q. Although you think from the standpoint of not beginning to lose control, the Corvette might be able to go around that curve at a speed a little faster than 60, which is the speed you determined that was the upper limit of safety to go around that curve without trying to lose it for your Oldsmobile?
A. That's true, and we are talking about me doing it in daylight and our Corvette working at night, so there are many factors here. But we are talking about speeds in that order.
Those "many factors" to which Mr. Dow and others alluded at trial included the driver's cornering ability, the potential for the car's bouncing on the washboard surface, the narrowness of the road, the centrifugal force pull of the car toward the northbound lane of traffic in the blind curve, and the depth perception of the driver at night on the unlit highway. With Sam Goodwin's undetailed description of his need to slow down at night (while coming closer to the city limits and presumably incurring a greater risk of northbound traffic), and the reasonable inferences raised by these additional factors which might trigger a momentary distress at 70 mph in that curve, the application of the brakes was not shown exclusively to have occurred at that instance because of GM's negligent advocating of braking in curves, and the jury could have reasonably concluded that the braking was the result of circumstances flowing from the high speed and an impulse to slow down.
Nevertheless, even with that view of the accident, the jury could still assess fault upon GM in this case from the evidence which *132 could be accepted as proving the allegation of paragraph 10 of the plaintiff's final amended petition:
"The speed at which plaintiff was operating the 1986 Corvette at the time of the September 13, 1986 accident was the result of the misrepresentations, promotions, exaggerations about power, speed, safety, handling and control and warranties made about the 1986 Corvette ... by ... General Motors." (emphasis added)
As opposed to plaintiff's negligent act of braking, the plaintiff's negligent act of speeding was shown to be influenced by GM's promotion. This detrimental influence upon the plaintiff's sense of safety and vincibility at high speeds in the Corvette could be weighed by the jury as a contributing cause of the accident, even after completely discounting the plaintiff's reliance upon GM's braking advertisements while negotiating the curve. Though plaintiff's speeding, whether in his truck or in the Corvette, could precipitate the same negligent braking with the same resulting crash in either vehicle, the speed differences between the 60 miles per hour which the plaintiff drove in his truck and the 70 miles per hour which the jury could conclude he was driving in the Corvette may be assessed as caused by GM's negligent acts.
Thus, on the crucial issue of the degree of Sam Goodwin's reliance upon GM's misrepresentations, the jury could have discounted greatly, if not altogether, the trial judge's emphasis that the plaintiff's act of braking was caused by GM's advocating the immediate application of the brakes in the middle of a highway curve. Instead, the jury could have reasonably determined that plaintiff's speeding was improperly influenced by GM.
Regarding the issue of speeding, however, the factors that caused such speeding were the responsibility of both the plaintiff and GM which the jury had to weigh. Such speeding, up to 85 mph immediately before entering the curve where he lost control, was admittedly in disobedience of his parents' warnings about speeding and, of course, in violation of the law. The jury could reasonably conclude that the plaintiff's choice to speed on the night in question as he approached the curve was directly his responsibility, indirectly affected by GM's prior advertising. As in Watson, it could be reasonably concluded that GM's actions had only "an indirect causative impact" on the plaintiff's immediate choice to speed on his trip into Shreveport that night.

Conclusion
Our exercise above testing various slants which may be fairly given to the evidence convinces us that the jury had a range of reasonable choices for the assessment of fault which included its 25% assessment of fault to GM. In the above quoted words of Anderson, "it is impossible to say that reasonable men could not reach different conclusions." Therefore, we conclude that the trial court erred in granting plaintiff's motion for JNOV. Accordingly, we reverse the judgment of the trial court granting the JNOV and reinstate the jury verdict. Having previously concluded in this opinion that, under the manifest error standard, the jury was not clearly wrong in finding that the plaintiff carried his burden of proof regarding the claim for negligent misrepresentation, we reinstate the judgment rendered in this matter by the trial court on September 29, 1995 in accordance with the jury verdict and that judgment is affirmed. Costs of this appeal are assessed to appellee.
REVERSED; ORIGINAL JUDGMENT REINSTATED AND AFFIRMED.

APPENDIX TO # 29,118-CA
This Appendix contains quotations from several General Motors' advertisements and representations about the 1986 Corvette, its speed, handling and braking capabilities.
1. January 1986: Road & Track Magazine
Anti-lock braking power you can grade on a curve.
You're driving 55 mph on a rain-slick curve. Suddenly the unexpected: You stand on the brake pedal and steer to stay in your lane. You might expect Europe's most exotic cars to handle such a crisis *133 effortlessly. Yet for all its awesome straight-line braking ability, Ferrari 308 GTSi failed to negotiate a 150-foot radius curve at maximum braking in USAC-certified testing. Lamborghini Countach failed. Lotus Esprit Turbo failed. Porsche 944 failed. Only the 1986 Corvette demonstrated the ability to stop in these conditions at the same time. Only Corvette made the turn while coming to a controlled stop. When conditions turn foul, Corvette's new computerized Bosch ABS II anti-lock braking system is designed to help improve a driver's ability to simultaneously brake and steer out of trouble. Why does the Corvette feature the world's most advanced braking technology? Because a world-class champion should give you the edge in an emergency. Corvette. A world-class champion.
2. September, 1985General Motors Corporation's Catalog for its 1986 Corvettes
There are a number of excellent reasons for taking a brand-new 1986 Corvette to West Germany, but the no-speed-limit autobahns are not the best ones....
... Example: It's backroads that really beckon the serious enthusiast. Other countries have great roads too, but Germany seems to have more of them, and German enthusiasts make such good use of them. Thus, it's not at all unusual to set out for a day's serious driving and encounter drivers who, like yourself, are out there for the pure joy of high-spirited little jaunts through the hills. This helps a dedicated Corvette driver appreciate even more the great capabilities built into his chosen automobile.
Obviously, two of those capabilities are tailor made for the autobahns, where very high speeds and equally high levels of traffic density are the rule. The high overall speed dictates that the most pleasant cars to drive will be the ones with good acceleration and ones with excellent high-speed cruising capability. There aren't many that score better than Corvette in these categories....
A light rain is falling. You come over the top of a hill, halfway through a long sweeping curve that keeps bending away out of sight ahead of you, when suddenly you come upon the grandmother of all traffic jams. What do you do? Nothing cute, that's for certain. You simply apply the brakes and hope for the best.
Your Corvette will stop. In fact, it will stop so well that you'll be proud, pleased and perfectly amazed. You can express your gratitude to one of the best friends you'll ever have, a device called the Bosch ABS II anti-lock braking system.
Bosch ABS II is fully described on pages 20 and 21, but simply put, what it does is monitor all four wheels and automatically "pump" the brakes when one or more wheels begin to slide. Its effect on the Corvette is to help prevent brake-induced wheel lockup and to shorten stopping distances on most surfaces. Its effect on me is even better. It makes me grin like a fool. Seriously though, anti-lock brakes are a remarkable and significant advance worthy of the proud heritage that's Corvette.
* * * * * *
The end of the first day's drive is worth the entire trip.... Rothenburg sits high on a hill, its defensive wall and stone towers still ready to repel besiegers, and you'll reach it through a winding series of perfectly parabolic 180-degree turns. Leave it in second gear and fly up the hill, letting those big Goodyear Gatorbacks do the work.
The 1986 Corvette weighs 3,234 lbs. This means that when achieving a lateral acceleration of 0.91g, or gravity force, the car is capable of staying on the road despite a sideways force of 3,000 lbs.
Corvette's suspension allows up to 0.91g of lateral acceleration. That is, a Corvette stays on the road even when the sideways force on a tight curve reaches 3,000 pounds and when the deceleration force during braking goes above 1g and actually exceeds the weight of the car. If these numbers aren't enough, look at some others: *134 the number of times Corvette has won on the track.
* * * * * *
... Corvette's suspension controls the weight shifts, and ABS II allows use of the brakes halfway through a high-speed curve.
* * * * * *
Important: A word about this catalog. We have tried to make this catalog as comprehensive and factual as possible.
3. Fall 1985: General Motors Corporation's Corvette News
1986 Corvette Gets More Whoapower
In 1986, great gets greater. Although outwardly the new Corvette appears unchanged, improved performance is always the objective of Chevrolet engineers. This year improved performance comes to you in a big way with the new Anti-lock Braking Systemstandard equipment on the '86 model.
* * * * * *
The 1986 Corvette braking system includes a master cylinder which has been redesigned to reduce mass. In addition, the aluminum suspension knuckles, front wheel bearings, and rear drive spindles have been modified for 1986 to incorporate wheel speed sensors at all four corners. Through these sensors, the computer monitors wheel speed at all times, not just during braking action. Should the computer determine that a wheel is about to lock up during a stop, it will assist the driver by modulating the brake pressure to the affected brake caliper to prevent lockup. The system controls each front wheel independently.
Should either rear wheel approach lockup, both rear brake calipers will be modulated together. Besides providing shorter stopping distances, the ABS system also provides a more controlled stop, which enhances the maneuverability of the car during severe braking. And you won't have to worry about ruining a good set of tires by flat stopping them during a panic stop.
4. From Corvette News.
Neil Bonnett drives Corvette. "Their performance is there, no question about it."
I ran an '85, '86 and '89 prototype.* The '85 was something of a hot rod, with AB-skid brakes and the engine was so new it was still green. I only ran a top speed of 133 mph down the straightaway. Overall, the '85 is a lot better than the '82 I own, and the '86 is really terrific. It's proof to me that the car is constantly being refined and that the guys in the Corvette group aren't sitting on it; they're doing everything they can to make it better.
* CN: The '85 was actually an '86 component vehicle, the '86 was a showroom was a stock-prepared '86 pilot and the '89 was an experimental development vehicle.
The '86, also brand new, had the new vehicle anti-theft system, anti-lock brakes, Z51 sports suspension, and shifter mounted overdrive button. It also had aluminum heads which are coming later in the model year. Since the engine was more broken in than the '85, I was able to run quicker on the straights, on up to 146 mph. And I knew it had run faster than that, but a severe dip in turn one held me back a bit.
5. Fall 1986: General Motors Corporation's Corvette News
Imagine if you will, a Corvette so quick that it can accelerate from zero to sixty in 4.6 seconds or cover the quarter mile in 13.2 seconds at 109 miles per hour ... a Corvette so fast that it could blast through the standing mile in just a tick over 30 seconds. Imagine observing that Corvette on an endless straightaway as the driver side steps the clutch at 3000 rpm and begins to row through the gears. The exhaust is not loud as the turbos go about their business coaxing 345 horsepower at 10 pounds boost from the engine. The seconds pass, a mile since the first chirp of the tires, and the still accelerating Corvette blasts past on its way to a top speed of 178 mph. Imagine, as a smile spreads across your face knowing that you, my friend, have just entered ...

*135 The Twin-Turbo Zone
6. Fall 1987: General Motors Corporation's Corvette News
[With respect to driving through a 90 degree, right-angle curve which is legally posted with a maximum advisory sign of 30 miles per hour, General Motors prepared and published the following "driving tip"]:
"A Grand Sport 80 driving tip: multiply all signs like this by at least two."
NORRIS, J., concurs with reasons.
WILLIAMS, J., concurs.
BROWN, J., dissents in part to reversal of JNOV with reasons.
NORRIS, Judge, concurring.
I respectfully concur.
Many times it is difficult to deduce the exact process by which a jury reaches its verdict. This case presents one of those difficult times. However, the criteria for the JNOV are very exacting, as the majority points out. See Anderson v. New Orleans Public Service Inc., 583 So.2d 829 (La.1991).
In the instant case, I do not believe the JNOV standard has been met. The allocation of fault hinged on close factual determinations: whether the plaintiff relied, or to what extent he relied, on GM's advertising, and whether such reliance contributed to his harm. Credibility was central to these determinations. The trial judge was not at liberty to reassign the jury's credibility call by way of JNOV, nor is this court at liberty to do so. May v. Jones, 28,106 (La.App.2d Cir. 5/8/96), 675 So.2d 275, writ denied 96-1466 (La.9/27/96), 679 So.2d 1354.
In my opinion, reached after closely examining this whole record, the trial judge erred in concluding that reasonable jurors could not have allocated only 25% fault to GM. Reasonable people, weighing the evidence in this case in light of the Watson factors, could have arrived at the same verdict as this jury regarding allocation of fault. The JNOV was improperly granted.
WILLIAMS, Judge, concurring.
The result reached is correct.
BROWN, Judge, dissenting.
All members of this appellate panel have concluded "that there is no manifest error in the jury's finding that the plaintiff relied on these misrepresentations in a manner which amounted to a substantial cause of the accident." Thus, reliance is no longer an issue. The discussion concerning what particular misrepresentation influenced the accident is a red herring. Sam Goodwin clearly relied on the entire concept being sold by GM.
The majority opinion concluded:
From his study of this information, the jury could conclude that Sam Goodwin had gained an exaggerated sense of safety from the misleading advertisements and other publications emphasizing the speed, handling and braking abilities of the Corvette while driving through any highway curve. (emphasis added).
Further, in product liability cases there is a presumption that if a proper warning had been given, it would have been read and heeded, and the accident avoided. Toups v. Sears Roebuck & Co., 507 So.2d 809 (La. 1987). Flagrant misrepresentations urging unsafe practices are greater wrongs than the failure to warn and the presumption of reliance should be equally applicable.
The issue presented in this appeal is whether comparative or victim fault should be implicated and if so, in what proportion. The trial court described GM's conduct as intentional, reckless, reprehensible and shameful. The majority opinion tags GM's conduct as "flagrant." The difficult question presented in this case is whether a comparison of fault should be made, that is, whether there are any policy considerations that would preclude its application. See Veazey v. Elmwood Plantation Associates, Ltd., 93-2818 (La.11/30/94), 650 So.2d 712; Bell v. Jet Wheel Blast, 462 So.2d 166 (La.1985).[1]
*136 The trial court in this case found that the application of victim fault would not deter future victims but would encourage continued reprehensible and shameful conduct designed to sell an immature and dangerous lifestyle. In fact, the trial court specifically concluded that "GM's conduct was intentional as well as reckless." Because such a policy decision is to be made by the court, not the jury, JNOV review standards are not applicable. Bell v. Jet Wheel Blast, supra.
Even if applicable, comparative fault is an affirmative defense. La. C.C.P. art. 1005; Murray v. Ramada Inns, 521 So.2d 1123 (La.1988). As such, GM bore the burden of proving by a preponderance of the evidence that the negligence of Sam Goodwin was a cause in fact of the accident.
The majority opinion states:
[GM's] advertisements further suggested or implied that the speeds which the Corvette was capable of obtaining were less dangerous because of the safety of the ABS [brake] system ...
At trial, the experts on both sides substantially agreed on certain critical facts about the accident. It was generally agreed that it was possible for the Corvette to negotiate the curve in question at a maximum speed of approximately 80 miles per hour. Second, the plaintiff erroneously applied the brakes after the car had begun negotiating the curve so that the added braking load on the tires, combined with the side load from centrifugal force against the tires in the curve, started the vehicle into the out of control, sideways slide.
GM urged Corvette owners to take curves at high speeds and extolled its braking system in those curves. All the experts testified that what caused this accident was the vehicle's loss of control when the brakes were applied. The ABS anti-lock brake system was a safety device that failed to perform as advertisedthat is, when suddenly the unexpected occurs in a rain-slick curve, "you stand on the brake pedal ... only Corvette (as opposed to Ferrari, Porsche, Lamborghini, etc.) made the turn while coming to a controlled stop." The asserted negligence of plaintiff, i.e., the erroneous application of the brakes, is the exact eventuality for which GM claimed the ABS anti-lock brake system was designed to guard against.
I respectfully dissent. The trial court would have committed clear legal error had it not granted the JNOV.
NOTES
[1] Goodwin testified that he drove on the road earlier that day in his father's pick-up on his way to and from school that morning, and again that afternoon to and from Jeff Lynn's house and once again in his Corvette on the way to the camp. He said he drove through the curve where the accident occurred at approximately 55 to 60 miles per hour.
[2] This claim arose out of a letter from GM to Corvette owners sent the same month in which the accident occurred describing a defect in the braking system which later proved inapplicable in this case.
[3] The petition alleged that GM manufactured and placed into commerce an attractive nuisance known as the Corvette, capable of speeds in excess of 200 % the maximum lawful speed limit and that the manufacturing, marketing and sale was negligent and unduly hazardous to the general public and particularly young and inexperienced drivers in whose hands it was foreseeable these dangerous vehicles would fall.
[4] We have attached as Appendix "A" to this opinion some of the language of these GM advertisements and other publications which the jury determined to be negligent misrepresentations.
[5] The testimony and report of the investigating officer who reviewed the site on the morning after the accident did not reveal rubber skid markings on the blacktop. However, the testimony of H.W. Saunders, who lived north of the accident site and who observed the accident scene on the morning after the accident, indicated that he saw what he described as "scrub marks" where the roadway was "rubbed clean" extending through the curve approximately 300 feet leading from the southbound lane across the north bound lane to the place where the vehicle clearly left the highway. The two sides disputed whether the braking began in the last 300 feet as indicated by Mr. Saunder's estimate or the last 150 feet as determined by plaintiff's experts.
[6] The jury interrogatory, which did not specifically detail the particular misrepresentations, merely asked: "Do you find that General Motors Corporation made negligent misrepresentations that were a substantial factor in causing injuries to Samuel Goodwin?"
[7] Both the motion for JNOV and the motion for directed verdict have been replaced in Federal Rule 50 with the motion for judgment as a matter of law. The criteria for making and granting the motion for judgment as a matter of law is the same as the prior motions. See Moore's Federal Practice, § 22.10 and 22.11.
[8] In Scott, the high court reversed the trial court's grant of a JNOV, which had modified the jury's allocation of fault, raising the plaintiff's liability from 40% to 100% and raising the total award from $380,000 to $500,000. The Court of Appeal affirmed the JNOV. In setting forth the criteria for granting a JNOV, the supreme court relied heavily on decisions of the federal Fifth Circuit, particularly Boeing v. Shipman, 411 F.2d 365 (5th Cir.1969).
[9] The Boeing case is frequently cited in Louisiana state jurisprudence as well as the federal jurisprudence. The U.S. Fifth Circuit decided Boeing sitting en banc for the expressed purpose of establishing the test for granting a motion for JNOV and directed verdict.
[10] Twice in his testimony, the plaintiff described his range of speed at the time of braking to be 65 to 70 mph. GM's expert, while listing a range of speed that included the plaintiff's estimate, testified that his speed could have been as great as 75 mph. The jury could therefore reasonably conclude, despite the trial judge's different view, that the car was traveling at 70 mph or slightly higher at the time of the application of the brakes.
[11] Mr. Dow was employed by the plaintiff to initially review the braking system and the accident scene. When his expert opinion was not used by the plaintiff in his case, GM introduced Mr. Dow's deposition testimony.
[1] The legislature in 1996 enacted La. C.C. art. 2323(B) which provides that comparative fault is a defense in all cases except intentional tort. This article was not applicable at the time of this accident; however, it excludes reductions due to victim fault in intentional torts.